HEAT EXCHANGERS, INC., Plaintiff-Appellee, *v.* AARON FRIEDMAN, INC., Defendant-Appellant.

First District (4th Division)    No. 80-210

Opinion filed May 14, 1981.

Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Chicago (Jerome N. Robbins and Michael A. Loizzi, Jr., of counsel), for appellant.

Teller, Levit & Silvertrust, P. C., of Chicago (Edward S. Margolis, of counsel), for appellee.

Mr. JUSTICE LINN delivered the opinion of the court:

Plaintiff, Heat Exchangers, Inc., brought this action in the first district municipal court of the circuit court of Cook County, seeking the price due on a sale of goods. Defendant, Aaron Friedman, Inc., counterclaimed for breach of express warranty and for breach of implied warranty of merchantability. Defendant also counterclaimed for negligence, alleging plaintiff was negligent in carrying out its contractual duties. The negligence count was dismissed for failing to state a cause of action, and the case went to trial on all the other claims. At the conclusion of a bench trial, the trial court entered judgment for plaintiff on the complaint and counterclaim.

On appeal, defendant contends: (1) the trial court erred in dismissing the negligence count of its counterclaim; (2) the judgment entered for plaintiff on the breach of warranty counterclaim is against the manifest weight of the evidence. Defendant does not challenge the judgment entered on the complaint, since defendant asserted no defense of breach of warranty in its answer to the complaint, but defendant contends its counterclaim should stand as a set-off against the damages won by plaintiff.

We affirm the dismissal of defendant's negligence claim. We reverse the judgment entered for plaintiff on the breach of warranty counterclaim and remand with directions to enter judgment for defendant on the counterclaim and for the trial court to hold a hearing to determine damages due defendant based on the evidence already presented in the record.

*Factual Background*

The goods sold in this case were 38 heat pumps, plus accessories, for a total price of approximately $18,000. Plaintiff, through its Koldwave division, manufactures and sells the heat pumps from its offices in Illinois. A heat pump is a machine designed to use water and air to produce heat and air-conditioning. Plaintiff makes four different models of heat pumps: a console model, a horizontal model, a vertical model, and a floor-to-ceiling model. The floor-to-ceiling model was the kind sold in this case. It differs from the other models only in the design of the outside cabinets. The internal components of all the models are essentially the

same and consist primarily of a motor compressor, strainer-drier, condensor, evaporator, connecting tubing, a blower, and various electrical parts. These parts are mounted on a chassis that fits inside the cabinets. Other parts include an air filter that fits into the front cabinet wall (in the case of a floor-to-ceiling model) and the unit controls that are designed to be accessible through an opening in the cabinet.

The floor-to-ceiling model is designed to be placed into the corner of a room and to be connected to the plumbing and electrical wiring inside the wall. It is designed to produce heat and air-conditioning for a limited space, such as one room in a multiple-unit structure. Required maintenance for the model includes periodic cleaning of the filter and the not-so-occasional lubrication of the working parts.

In early 1973, the Darvin Convalescent and Nursing Center, Inc., determined that it would expand its nursing home in Livonia, Michigan, to a 132-bed structure from an approximately 55-bed facility. The Michigan engineering firm hired to prepare plans and specifications for all the mechanical parts of the expansion was Master Temp, Inc. Master Temp submitted plans that included the use of heat pumps in the structure, and plaintiff's Koldwave floor-to-ceiling units were chosen based on plaintiff's successful bid.

Pursuant to this bid, plaintiff prepared shop drawings. These drawings showed the design of its heat pumps and gave dimensions to be used by the general contractor in constructing the new building. Based on these shop drawings, the general contractor could construct the plumbing and electrical wiring within the walls so that connecting pipes and wires would protrude from the walls in the area in which the parts of the heat pumps were to be connected. Thus, the heat pumps, if designed according to the shop drawings, could be installed after the building and its rooms were almost completed.

The general contractor hired to build the extension was defendant, a Michigan corporation run by Aaron Friedman, its president. In April 1974, defendant sent a purchase order for 38 heat pumps to plaintiff's representative in Michigan, Logan-Sommerville, Inc. This purchase order was sent on to plaintiff and plaintiff accepted the order and all its terms. One of the terms contained in this purchase order was the following:

"Suppliers of materials * * * guarantee all work and materials for a period of one year * * *, and agree to correct said defects in work or material at their own cost and expense."

Besides the purchase order, there existed another document of significance, plaintiff's engineering manual supplied with its products. One full page of this manual was entitled, "Warranties." On this page were two alleged warranties made with regard to the products. The head-

ing of these warranties was in large, bold print, while the wording of the warranties was in small print. The warranties read essentially as follows:

## "1 YEAR WARRANTY

Each Koldwave heat pump and air conditioner is warranted to be free from defect in materials and workmanship under normal use * * * for a period of one year from date of installation * * *. The manufacturer's sole obligation under this warranty shall be limited to furnishing replacement parts F.O.B. factory, Skokie, Ill., for any parts which the manufacturer's examination shall prove to its satisfaction to be defective.

## 4 YEAR ADDITIONAL WARRANTY

In addition to the above mentioned first year warranty * * *, the manufacturer warrants to the original purchaser that it will, at any time during the next four years following the expiration of the first year warranty, furnish replacement parts for the sealed refrigeration system only. This includes motor compressor, condensor, evaporator, and internal connecting tubing or parts thereof, including the accumulator, strainer, dryer when used on the original equipment, for any of these parts which are proven to the satisfaction of the manufacturer to be inoperative due to defects in material or factory workmanship. * * *. Repairs to the refrigerant system will be made with a nominal service labor charge upon presentation of the conditioner * * * to the Koldwave Dealer or Distributor from whom the unit was purchased.

* * *

This Warranty is in lieu of all other warranties expressed or implied and of all other obligations or liabilities on the part of [plaintiff], and we neither assume nor authorize any other person to assume for us any obligation or liability in connection with [the product]."

Friedman admitted at trial that he had seen this page of the manual, but it was never established when his company received this manual or when he saw this page.

After the purchase order was accepted, a series of delays in delivery occurred, with defendant repeatedly requesting delivery and plaintiff repeatedly promising delivery. Also, there was a delay in plaintiff's sending the shop drawings to defendant so defendant could construct the plumbing and wiring and finish the walls of the building. These shop drawings apparently arrived in the late summer of 1974, and defendant completed the necessary construction of the walls. The heat pumps and their accessories were shipped in three installments in October and November 1974, with the last installment arriving in the middle of

November 1974. On the shipping invoices that arrived with the heat pumps was written that the heat pumps were being sold with an "additional 4 year warranty."

Eight of the cabinets for the heat pumps arrived in a damaged condition. Defendant informed Logan-Sommerville, plaintiff's representative in Michigan, of this fact. Despite the damage, defendant accepted the goods, and in this action it does not appear that defendant is seeking damages because of the condition of the cabinets when delivered.

The process of installing the heat pumps began in December 1974 and ended in January 1975. While installing the heat pumps, defendant discovered that the majority of the heat pumps were not designed according to the shop drawings prepared by plaintiff. There were basically two discrepancies. First, the cabinets were all in one piece. This essentially caused a problem in mathematics. The cabinets were to be carried into a room in a horizontal position. They were then to be lifted to a vertical position and put into the corner of the room. Since the design of the cabinets was floor-to-ceiling, it was impossible to raise the cabinets up to a vertical position once inside a room because they were in one piece. The attempt would be like trying to raise a 10-foot-high file cabinet from a horizontal position to a vertical position inside a 10-foot-high room. It cannot be done unless a hole is made in the ceiling. According to the shop drawings, the cabinets were supposed to be in two parts, a bottom part consisting of the bulk of the cabinet, and a top part called a "collar" that could be installed after the bottom was placed into the wall.

The second discrepancy was in the basic design of the back wall of the cabinets and the internal components of the heat pumps. The water pipes and electrical wiring that defendant had constructed to extend from the wall were at one height, in accordance with the shop drawings, and the holes in the back walls of the cabinets and the place on the internal components where the pipes and wiring were to be connected were actually designed for a different height. To exaggerate, it could be said that the pipes and wiring in the wall were placed just above the floor and the holes in the cabinets, and the internal connecting parts were designed for connection just below the ceiling.

Defendant informed Logan-Sommerville of these problems. Logan-Sommerville authorized defendant to take necessary measures to change the pipes and wiring in the walls and to cut the cabinets so they could be placed upright in the rooms. Defendant incurred an expense of approximately $6,000 to complete the necessary changes. In March 1975, plaintiff offered a set-off on the price of the units of approximately $2,800 for the work. Defendant rejected this offer and this matter was left in abeyance.

After the units were installed, defendant began the process of putting the front panels on the heat pumps. The front panels would not fit. The

front panels were designed to be screwed into the remaining parts of the cabinets. However, the internal components of the heat pumps extended too far from the back of the cabinets and prevented the front panels from being put onto the units. This problem existed in almost all of the heat pumps.

Defendant informed Logan-Sommerville of this problem. Representatives of Logan-Sommerville came to the nursing home and reworked the front panels to make them fit. They redesigned the filter holder in the panels so they would hold thinner filters, thus allowing for the internal components to come closer to the front panels. They also put in new screws to force the panels to go on. However, this action resulted in the panels being "bowed," meaning the bottom and top of each panel bent out away from the rest of the cabinet, while the center part bent towards the internal components. One problem this created, other than unsightliness, was that air from the room could get inside a unit through cracks in the top and bottom of the unit. The heat pumps were designed to take air in only through the filter where the air was purified. The front panels are in the same condition today.

In February 1975, the nursing home began placing patients into some of the rooms. At this time, the nursing home administrator discovered a problem that would constantly recur over at least the next two years: the heat pumps would not work for any reasonable length of time. It became apparent that any given heat pump would work for a while and then stop working. The major problem with the heat pumps was that the motor compressors continuously burned out. Other problems included oil and water leaks, clogged coils, faulty strainer-driers, and faulty thermostats. For the next few months following February 1975, the nursing home administrator continued to place more patients into the new rooms and continued to discover more heat pumps that would not work for any length of time.

Defendant informed Logan-Sommerville of the problems, and it in turn informed plaintiff. In April 1975, Joe Pius, an engineer working for plaintiff, came to the nursing home to inspect the heat pumps. As a result of this visit, repair work was done on the heat pumps, with several compressors being replaced. The heat pumps continued to break down.

Pius came again in May 1975. As a result of this visit, more repair work was done on the units, with 12 more compressors being replaced. After this work was done, plaintiff insisted that a payment of $10,000 be made by defendant towards the price for the heat pumps. Defendant paid this $10,000, which left defendant still owing approximately $8,000.

While the above series of repairs was going on, plaintiff discovered that many of the heat pumps it had sold to numerous contractors throughout the country were also breaking down. Plaintiff discovered that a primary cause of the failures was a defective strainer-drier. One

function of the strainer-drier was to absorb moisture in the air inside the unit. To perform this function, the strainer-drier contained a chemical referred to in the record as "dessicant." The defect discovered in the strainer-drier was that the dessicant was leaking out of it and into the connecting tubing in the unit. This defect would cause, among other things, the motor compressor to fail. Plaintiff never informed defendant of this discovery.

After plaintiff had made the second series of repairs, the heat pumps continued to break down. Pius came again to the nursing home in August 1975. At least nine more compressors were replaced. Also, Pius had several strainer-driers replaced. Thereafter, the units continued to break down.

Defendant called Logan-Sommerville on repeated occasions to see what could be done about the continuing problem. Logan-Sommerville suggested that defendant contact a local company called Huron Air Conditioning Co., to work on the units. Defendant contacted Huron. In early October 1975, Huron replaced four compressors and four strainer-driers with its own brand of components. Huron also did numerous repair work on many of the units to get them running. The units continued to break down.

Defendant continued to complain to Logan-Sommerville about the problems with the heat pumps. However, nothing was done by plaintiff. Defendant began to rely on Huron Air Conditioning to do repairs. Defendant paid all of Huron's bills. In November 1975, Huron came to the nursing home several times to repair many of the units. In November it replaced three compressors and three strainer-driers. Most of the units continued to break down. Huron came several times in early December 1975. It worked on many of the units to get them running. It replaced three more compressors and strainer-driers. Many of the units continued to break down.

In the middle of December 1975, defendant contacted plaintiff to see what could be done about the ever present problems with the heat pumps. After this, on December 12, 1975, plaintiff sent a letter to defendant which said that plaintiff would do the following:

"1. KOLDWAVE will furnish component parts and manpower to change drier-strainers and compressors in all units requiring same.
2. KOLDWAVE will furnish new, front access panels for all units requiring same to assume proper fit."

The letter also requested payment of $5,500 after the above work was completed.

Aaron Friedman, president of defendant company, did not see this letter until some time in January 1976 because he had been out of town when it was received by his company. Friedman was the only person in

defendant company authorized to take any action on such a letter. When Friedman returned in January 1976, he called plaintiff. Apparently, a preliminary agreement was reached to have plaintiff fix the heat pumps. On January 19, 1976, plaintiff sent Friedman a letter supposedly confirming this agreement. However, the letter allegedly contained important terms not agreed upon. In significant part the letter read as follows:

"To confirm our telephone conversation of today, KOLDWAVE will inspect and perform necessary repairs to the KOLDWAVE heat pumps installed at subject project. This work, to be accomplished here at the factory, will be on a no charge basis. In addition, we will supply suitable front access panels to accommodate filter frames and unit chassis at no charge.

All that is required on your part is the following:

1. Removal of the equipment at the jobsite.

2. Freight costs for shipping the equipment to the factory and back to the jobsite.

3. Installation of reworked equipment at the jobsite."

Friedman showed the letter to the nursing home administrator. The nursing home administrator said it would be impossible to have all the heat pumps removed in the middle of the winter. The nursing home would have to close. Friedman informed Logan-Sommerville that defendant could not accept the offer contained in the letter. Defendant, thereafter, continued to rely on Huron Air Conditioning to repair the heat pumps as they went out.

In late January 1976, Huron came to the nursing home several more times and repaired many of the units to get them working. Eight more compressors and eight more strainer-driers were replaced. At least half the units continued to break down on a regular basis. Further attempts were made to get plaintiff to repair the units, but these negotiations broke down in June 1976 when plaintiff sent a representative to Michigan. The representative arrived at the airport, and no one was there to meet him because of some mix-up on the time he was supposed to have arrived. The representative flew back to Chicago.

In August 1976, defendant discovered that the strainer-driers in the heat pumps were a major cause of many of the problems. It replaced all of plaintiff's brand of strainer-driers with another brand. However, there were still recurring problems with many of the units, and at the time of trial 10 units were not operating.

Throughout the period of breakdowns and repairs described above, the nursing home continuously moved patients from rooms in which the units were down to rooms in which the units operated. Then, when the units that were down had been repaired, the units that worked went down, and the patients were shifted again. For the cold months, the

nursing home purchased 14 electrical heaters for use in the rooms where the units were not operating. These heaters were also shifted around many times.

In February 1977, plaintiff filed this action for the approximately $8,000 still due on the price of the heat pumps. Defendant filed its counterclaim seeking damages for breach of the one-year express warranty found in the original purchase order and for breach of the implied warranty of merchantability. Defendant also claimed damages for breach of the additional four-year warranty found on plaintiff's "warranties" page in the engineering manual and mentioned on plaintiff's invoices that had been sent with the heat pumps. Defendant also filed a negligence count which was dismissed. The damages claimed by defendant under all the counts consisted basically of the costs incurred by defendant to repair the heat pumps and keep them running and the cost of replacing all of the heat pumps.

Prior to trial, plaintiff requested defendant to admit a certain fact—that the warranties contained in the engineering manual were the warranties made by plaintiff concerning the heat pumps. In answer, defendant admitted that the warranties in the manual contained "some of the warranties" made concerning the heat pumps. Defendant stated that other warranties were also made—the one-year express warranty contained in the purchase order, and the implied warranty of merchantability.

Also prior to trial, on September 1, 1978, Pius, plaintiff's employee, was allowed to go to the nursing home to inspect the heat pumps. He found that many of the heat pumps had dirty filters and on some the pressure was set too low. At trial, he stated that the correction of these problems should make the units operational.

At trial, expert testimony established that one could expect, as commercially reasonable, that three to five percent of the heat pumps would break down in the first year of operation. In the present case, there was close to a 100-percent failure.

Judgment was entered for plaintiff on both the complaint and counterclaim, and this appeal followed.

OPINION

I

The first issue we consider is whether the judgment entered for plaintiff on the counterclaim is against the manifest weight of the evidence. The trial court did not make any conclusions of fact or law before entering judgment for plaintiff. However, it is clear from the record that the only conclusion the trial court could have reached was that the heat pumps, when delivered, were defective in material and work-

manship and were not merchantable as that term is defined by section 2—314 of the Commercial Code (Ill. Rev. Stat. 1979, ch. 26, par. 2—314).

Nevertheless, whether the heat pumps were defective in material and workmanship and whether the heat pumps were merchantable are not the issues in this case. Plaintiff has contended throughout that its sole obligation under the contract, if the heat pumps were defective, was to furnish replacement parts. Plaintiff maintains that, at all times, it acted in conformity with this obligation, and thus there was no breach of contract. It is apparent that the trial court's decision was based on its acceptance of the above contentions. Therefore, the first specific issue we must address is whether plaintiff's sole obligation under the contract was to furnish replacement parts that were shown to be defective. We hold that for at least the first year after delivery this was not plaintiff's sole obligation.

The decision on this issue is made complicated by the admissions on the part of both parties. Both agree that the one-year warranty contained in defendant's purchase order was part of the contract. Under this warranty, plaintiff guaranteed that its products would be free of defects for a period of one year. Plaintiff's obligation under this warranty was to correct all defects at its own cost and expense.

Both parties agree that the two warranties in plaintiff's engineering manual were "some of the warranties" applicable to the products. Thus, by admission, these two warranties must also have been part of the contract. Under the first of the two warranties, plaintiff warranted that its products would be free from defects for a period of one year after installation. Plaintiff's "sole obligation" under this warranty was to furnish replacement parts, f.o.b. factory.

The second warranty found in plaintiff's engineering manual was to be in effect for the four years after the first-year warranty expired. Though not precisely worded, it warranted that many of the internal components would be free of defects for those four years. Plaintiff's obligation under this warranty was to furnish replacement parts. This warranty concluded with the clause that it was made in lieu of all other warranties, express or implied, and in lieu of all other obligations or liabilities on plaintiff's part.

Finally, both parties agree that the implied warranty of merchantability was not properly disclaimed in this case and was applicable to the products. However, as correctly pointed out by plaintiff, if plaintiff and defendant expressly agreed that plaintiff's sole obligation under the contract was to furnish replacement parts, then defendant's sole remedy for breach of any warranty, express or implied, was to have replacement parts furnished to it, and unless this remedy "failed of its essential purpose" (Ill. Rev. Stat. 1979, ch. 26, par. 2—719(2)), defendant could seek no other remedy for breach of any warranty, express or implied.

*Schultz v. Jackson* (1979), 67 Ill. App. 3d 889, 385 N.E.2d 162; *Adams v. J. I. Case Co.* (1970), 125 Ill. App. 2d 388, 261 N.E.2d 1.

The two first-year warranties are the crucial factors in this case. The language of the four-year additional warranty could not come into effect until the first-year warranties had expired. As we will discuss, the language of the four-year warranty is irrelevant to a decision in this case. But first we must discuss the two first-year warranties to determine plaintiff's obligation during the first year.

Both first-year warranties cover all defects. In this the warranties are consistent. However, one warranty states that plaintiff's obligation is to repair all defects at its own expense. The other states that plaintiff is solely obligated to furnish replacement parts. This language of the two warranties is obviously inconsistent. The question is: which warranty controls?

For the answer we must first look to section 2—317 of the Commercial Code (Ill. Rev. Stat. 1979, ch. 26, par. 2—317), where it says: "Warranties whether express or implied shall be construed as consistent with each other and as cumulative, but if such construction is unreasonable the intention of the parties shall determine which warranty is dominant." Thus, whenever reasonable, warranties should be construed as consistent and cumulative.

■■ To a certain extent the two one-year warranties can be construed as consistent and cumulative. Both cover all defects. Also, the engineering manual warranty states that it comes into being upon installation of the products. The purchase order warranty states that it is merely for "one year." It does not state when the one-year period begins. However, it is obvious that it could only mean one year from the time of delivery. Though the contract was entered into in April 1974, the one-year period could not have begun then because the warranty would have been useless until the time of delivery, and the parties could not have intended for a warranty period to run while the seller still retained the products.

From the above, we can reach the following conclusions. From the time of delivery, which was in October and November of 1974, until the time of installation, which was in December 1974 and January 1975, the parties must have intended only for the purchase order warranty to be in effect. From a time beginning one year after delivery and ending one year after installation, the parties must have intended for the engineering manual warranty to be in effect. In this way the warranties are consistent and cumulative.

■■ The inconsistency occurs during the interim. Both warranties were potentially in existence during the period beginning after installation and ending one year after delivery. It would be unreasonable to declare that

plaintiff's obligation during this period was, on the one hand, to repair all defects at its own expense, and, on the other hand, merely to furnish replacement parts. We must determine which warranty was intended to be dominant.

To determine which was dominant, we can look at section 2—316(1) of the Code (Ill. Rev. Stat. 1979, ch. 26, par. 2—316(1)), where it is said:

> "Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2—202) negation or limitation is inoperative to the extent that such construction is unreasonable."

Under this section, if one gives a warranty with an expanded obligation and in the same agreement attempts to give a similar warranty with a limited obligation, then the attempt to limit warranty is rendered inoperative. Because of this section, it becomes clear that the purchase order warranty was in effect from the time beginning after installation until one year after delivery. Plaintiff's attempt to limit the warranty and obligation under that warranty was rendered inoperative. The more extensive obligation must control.

■■ Thus plaintiff's obligation under the contract during the first year after delivery was to repair all defects at its own expense. The next issue is whether plaintiff carried out this obligation. We hold plaintiff did not.

We begin our discussion with the period of time during which installation was in progress. Several defects in the basic design of the heat pumps were discovered at this time. The units were not designed in accordance with the shop drawings provided by plaintiff. As a result, defendant, with the permission of plaintiff's representative, Logan-Sommerville, made substantial alterations to both the cabinetry design of the heat pumps and the plumbing and wiring in the walls. Defendant spent approximately $6,000 to complete these alterations. Plaintiff offered to remit less than half this amount. In essence, plaintiff refused to carry out its obligation to repair all defects at its own expense. However, it appears that in good faith plaintiff believed the actual cost of repairs should have been only the amount it offered to remit, and at best there was only a partial breach of its obligation at this time.

Plaintiff attempted at this point to repair one of the defects in the design. Its representatives attempted to repair the defect in the front panels which would not fit on the units. Nevertheless, plaintiff failed to make the repair properly. The front panels still do not fit properly. Plaintiff's obligation was to repair defects, not merely to attempt such repairs. Thus, plaintiff's failure to repair the defects in the front panels

constituted a breach of its obligation. Apparently, defendant chose to treat this as only a partial breach.

After the units were installed, they constantly broke down. Plaintiff made three major attempts to repair the defects in the units. It failed in each attempt. It was obligated to repair the defects. It had failed to perform this obligation.

After plaintiff's third attempt to repair the defects in the units in August 1975, defendant called on Huron Air Conditioning to repair the units. Huron was suggested to defendant by plaintiff's representative, Logan-Sommerville. Huron made attempts in October 1975 and November 1975 to repair the units. Still the units broke down. Defendant paid for Huron's services and plaintiff made no offer to remit the costs of these services to defendant.

From the above sequence of events, only one conclusion can be reached. Within one year after delivery, plaintiff had substantially breached its promise to repair all defects at its own expense. Hence, it had totally breached the provisions of the one-year warranty contained in the purchase order. Also, it was apparent by this time that the heat pumps were not fit for their ordinary purpose and had not been so from the beginning. Thus, plaintiff had also breached the implied warranty of merchantability.

Since the contract had been totally breached by plaintiff within the first year of delivery, anything that happened thereafter is irrelevant to the issue of liability in this case. Plaintiff's December 1975 and January 1976 offers to make repairs did not have to be accepted by defendant. Plaintiff was not attempting to conform with the provisions of the contract but was attempting to salvage a contract it had already breached in its entirety. Also, the provisions of the four-year warranty and the limitation of liability clause under that warranty never came into being. The contract was already breached by plaintiff and it could not thereafter assert any limitation upon its liability contained in that four-year warranty.

For the breach of this contract that occurred within one year after delivery, defendant is entitled to any of the remedies available to him under the Commercial Code. There is no clause in the purchase order that was accepted by plaintiff which limits plaintiff's liability solely to replacement of defective parts for breaches of warranty that occurred in the first year after delivery. Since the contract was totally breached by plaintiff within the first year after delivery, defendant was entitled to seek whatever damages he could prove. Anything that occurred after that first year merely goes to the question of damages. Defendant incurred considerable expense to try to keep the heat pumps working. Whether

defendant can recover these expenses as damages will be a matter for the trial court to determine on remand. Also, there is evidence to show that most of the heat pumps may be operational today and the remaining heat pumps are not operational because of poor maintenance. This, again, merely goes to the question of damages recoverable by defendant.

We therefore conclude that the finding of judgment for plaintiff on the counterclaim is against the manifest weight of the evidence. We also conclude that judgment should have been entered for defendant on the counterclaim. At this time, we make no determination on the issue of damages, leaving that for the trial court to determine on remand.

## II

■■ The second issue raised is whether the dismissal of defendant's count in negligence was error. The count in negligence alleges that plaintiff negligently failed to perform its contractual duties. The count seeks economic losses as damages. We find that our decision in *Album Graphics, Inc. v. Beatrice Foods Co.* (1980), 87 Ill. App. 3d 338, 408 N.E.2d 1041, completely disposes of this issue. There we held that purely economic losses, caused by failure to perform essentially contractual duties, were not recoverable in negligence when the parties are in privity of contract. Thus, we hold the negligence count was properly dismissed.

Accordingly, for the reasons noted, we affirm the decision of the trial court in dismissing defendant's count in negligence. We reverse the judgment entered for plaintiff on the counterclaim concerning defendant's claim for breach of warranty and remand with directions to the trial court to enter judgment for the defendant on the issue of liability and to hold a hearing to determine damages based on the evidence already presented in the record.

Affirmed in part; reversed and remanded in part.

JOHNSON and JIGANTI, JJ., concur.