INSTITUTO NACIONAL DE COMER-
CIALIZACION AGRICOLA
(INDECA), Plaintiff,

v.

CONTINENTAL ILLINOIS NATIONAL
BANK AND TRUST COMPANY OF
CHICAGO, et al., Defendants.

No. 81 C 1934.

United States District Court,
N. D. Illinois, E. D.

Jan. 21, 1982.

Court have drafted Rule 1.04E to bar access to themselves as well.

John A. Field, III, Jerris, Leonard & Assoc., P. C., Washington, D. C., Edward McGovern, McGuan & McGovern, Chicago, Ill., for plaintiff.

Gerald D. Mindell, Arthur F. Radke, Patricia T. Adelman, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

### SHADUR, District Judge.

Instituto Nacional de Comercializacion Agricola ("Indeca"), a quasi-national corporation organized under Guatemalan law, has as part of its responsibility the purchase of foodstuffs and agricultural staples for the Guatemalan people on international markets. It sues a group of defendants for an allegedly fraudulent scheme in which Indeca was bilked of over $5 million in its attempted purchase of 6,000 metric tons of black beans that proved to be nonexistent. Continental Illinois National Bank and Trust Company of Chicago ("Continental"), charged with negligence (Count III of Indeca's Amended Complaint, the "Complaint"), fraud (Count IV) and breach of contract (Count V), has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56 or in the alternative dismissal of the Complaint under Rule 12(b)(6). For the reasons stated in this memorandum opinion and order Continental's summary judgment motion is denied as to Counts III and IV but granted as to Count V.[1]

*Facts*

Indeca sought to purchase 6,000 metric tons of black beans from RuMex International, Inc. ("RuMex"). To facilitate that purchase Indeca negotiated with Banco de Guatemala ("Banco") for the issuance of a letter of credit (the "Letter"). Under the provisions of the Letter (like all letters of credit), Banco as issuing bank was required to render payment when presented with documents in complete conformity with the Letter's requirements. Because the seller of the beans was located in the United States, Banco engaged Continental's services to confirm the Letter.

On September 5, 1980 several RuMex principals appeared at Continental and presented various documents as being in claimed conformity with the Letter's requirements. Upon review, Continental employees observed that some of the documents were non-conforming. After changes were made in the documents (more on this subject later in this opinion), on September 9 Continental determined that a complete set of documents in full conformance with the Letter's requirements had now been submitted. Continental honored the RuMex draft and transferred the appropriate sum into the RuMex account. Continental then debited Banco's account for the sum paid to RuMex plus Continental's fee and forwarded the documents to Banco.

Banco in turn transmitted the documents to Indeca, which received them September 24. On September 30 Indeca signed a statement confirming that the documents conformed to the Letter's requirements and authorizing payment to RuMex.

Time passed, and the beans (already overdue by September 30) never arrived in Guatemala. In February 1981 Indeca's attorneys communicated with Continental's attorneys and stated orally that the documents negotiated by Continental and then approved by Banco and Indeca had not in fact conformed to the Letter. Soon thereafter Indeca filed suit and now attempts to

---

1. For analytical reasons this opinion deals with the contested counts in the sequence IV, V, III.

Regrettably the analysis owes little to the parties' briefing.

hold Continental responsible for some 26 discrepancies between the documents presented by RuMex and the Letter's requirements.

## Count IV—Fraud

Indeca charges in Count IV that Continental committed a fraud by (1) accepting non-conforming documents, (2) authoring documents without then obtaining the required legalization and (3) accepting documents that Continental knew contained forged legalizations. Indeca is not alleging a fraud in the typical sense: There is no allegation that Continental itself set out to deceive Indeca. Indeca is rather alleging that Continental is liable because it knowingly assisted RuMex in the fraudulent procurement of payment under the Letter.

██ Under Illinois law "whoever participates in a fraudulent act is guilty of fraud."[2] *Citizens Savings and Loan Association v. Fischer*, 67 Ill.App.2d 315, 323, 214 N.E.2d 612, 616 (5th Dist. 1966); *accord, Piff v. Berresheim*, 405 Ill. 617, 625, 92 N.E.2d 113, 118 (1950); *Creighton v. Elgin*, 395 Ill. 87, 103, 69 N.E.2d 501, 509 (1946). Defendant need not benefit from the fraudulent scheme to be liable. *Tcherepnin v. Franz*, 393 F.Supp. 1197, 1216 (N.D.Ill.1975). Under those cases Indeca has a cause of action if it can prove that Continental facilitated RuMex' fraud by knowingly accepting forged documents.[3]

██ Continental first urges dismissal because Indeca has not adequately pleaded fraud under the requirements of Rule 9(b). That argument is unpersuasive. Indeca's allegation is simple and straightforward: Continental knowingly accepted non-conforming and fraudulent documents, thereby facilitating the alleged fraud committed by RuMex. Indeca has specified 26 such discrepancies and the exact time and place of Continental's actions. Continental clearly has adequate notice of the charge, so that the requirements of Rule 9(b) have been satisfied.

Continental has a much stronger argument from a summary judgment perspective. Indeca has not uncovered any direct evidence of fraud in the classical sense on Continental's part. Continental's initial contact with the RuMex people was quite normal. After receiving the documents, Continental identified several problems to RuMex's representatives. Those difficulties were clearly recorded on Continental's worksheet (prepared for just that purpose) and dealt with individually. When Continental was satisfied that all the documents were conforming, it honored the demand and made payment.

Indeca essentially contends that some of the documents never truly conformed and—more significant for current purposes—that the documents were so blatantly non-genuine that an inference of fraud is possible. Most serious of the discrepancies in that respect is that involving the certificate of origin, which was required to be legalized by a representative of the Guatemalan government. Alena Barta ("Barta"), Continental's employee with direct responsibility for checking the RuMex documents, first received them from RuMex representatives about 1:30 p. m. September 5 (Barta Dep. 15). Barta immediately identified and advised the RuMex people of the fact that the certificate of origin was not legalized. *Later the same afternoon* RuMex representatives brought Barta a purportedly legalized certificate of origin (Barta Dep. 54). Barta accepted that "legalization" despite the fact that the Guatemalan Consulate is located in

---

**2.** In this diversity action Illinois choice-of-law doctrines dictate the substantive law to be applied. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Although both Indeca and Banco are Guatemala-based, there has been no suggestion by either party that the Court should not look to Illinois substantive law as well.

**3.** As hereafter discussed, there is a disputed factual issue as to whether Continental knowingly accepted a forged document. For that reason the Court is not now required to address the difficult legal question whether, if knowledge were *not* shown, recklessness would be sufficient to impose liability on Continental. *See, e..g., Citizens Savings*, 67 Ill.App.2d at 322–23, 214 N.E.2d at 615–16.

Miami, Florida and the newly-affixed "legalization" (consisting of a rubber stamp and *manual* signature) bore a Miami address.

Curiously enough, none of the attorneys probed the issue further at Barta's deposition. It is of course possible that a trier of fact might determine that Barta was simply (or extremely) negligent in accepting the document with a Miami stamp perhaps three hours after having rejected it for lacking that stamp. But clearly the factfinder could instead conclude that Barta had knowingly accepted a forged document.

■ We are therefore confronted with a "genuine issue of material fact."[4] Summary judgment must be denied as to Count IV.

### Count V

■ In Count V Indeca asserts that by accepting non-conforming documents Continental breached a contract with Indeca.[5] It does not however allege the existence of a specific Indeca-Continental contract. Rather Indeca contends that Continental, as a confirming bank, somehow became part of the Indeca-Banco contract.

To state Indeca's claim in those terms demonstrates its fallacy. There was in fact no contractual relationship between Indeca and Continental. Continental was contractually obligated to Banco alone.

But it is not necessary to speculate on that subject, for the parties' relationships are controlled by the provisions of the Uniform Commercial Code ("UCC")[6] (and perhaps, as hereafter discussed, the Uniform Customs and Practice for Documentary Credits, "UCP"). Indeca's argument is based almost entirely on UCC § 5-107(2):

> A confirming bank by confirming a credit becomes directly obligated on the credit to the extent of its confirmation as though it were its issuer and acquires the rights of an issuer.

It makes the unsupported quantum leap from that provision to the conclusion that Continental (admittedly a "confirming bank") owed *Indeca* a duty to examine the documents with care.

True enough, under UCC § 5-109(2) an issuer "must examine documents with care so as to ascertain that on their face they appear to comply with the terms of the credit...." But the fact that Continental had a duty to examine the documents with care does not mean that it owed that duty to Indeca. Section 5-107(2) is more logically read as establishing that by confirming the Letter (1) Continental became "directly obligated" to pay to the beneficiary (Ru-Mex) and (2) Continental acquired the "rights" of an issuer—the right to collect from *its* customer, Banco. For Continental to acquire that *right* as to *Banco*, Section 5-109(2) imposed on it the *duty to Banco*

---

**4.** Under the circumstances it is unnecessary to comment on whether, taken together with the legalization matter, any of the 25 other alleged discrepancies could singly or in the aggregate support an inference of fraud. Even Indeca's counsel has conceded that many are trivial and would probably not themselves create such an inference. But the blatant nature of the claimed legalization business allows Indeca's action to survive, and the trier of fact may consider whether any of the other matters (most particularly, Complaint ¶¶ 34–39 emphasize an irregularity in the Bill of Lading known to Continental) are corroborative of a fraud determination.

**5.** Were Indeca successful on that score, it would clearly have talked itself out of court on Count III. Under nearly uniform Illinois law a plaintiff cannot recover in tort for purely economic losses against a party with whom it is in

privity of contract. *Heat Exchangers, Inc. v. Aaron Friedman, Inc.*, 96 Ill.App.3d 376, 389, 51 Ill.Dec. 828, 837, 421 N.E.2d 336, 345 (1st Dist. 1981). It is true that one Illinois Appellate Court decision has permitted such an action: *Moorman Mfg. Co. v. National Tank Co.*, 92 Ill.App.3d 136, 147, 47 Ill.Dec. 186, 195, 414 N.E.2d 1302, 1311 (4th Dist. 1980), now pending before the Illinois Supreme Court. But under *Erie v. Tompkins* ground rules, in case of a split in authority this Court is bound to follow decisions of the Illinois Appellate Court for the First District, where this Court sits. *Commercial Discount Corp. v. King*, 515 F.Supp. 988, 990 (N.D.Ill.1981).

**6.** All UCC Section citations in this opinion are to the Illinois version, Ill.Rev.Stat. ch. 26. Section numbering in Illinois conforms to that in the Uniform Code.

(its customer) to examine the documents with care.[7] After all, confirming banks take money only from the issuing bank, which then has an independent obligation to examine the letter of credit. It would not make sense to read the UCC provisions as implying a duty of the confirming bank to the customer of the original issuing bank.

Direct confirmation of this reading is given by the definitional section of UCC Article 5. Section 5–109 (on which Indeca seeks to rely) is captioned "Issuer's Obligation to Its Customer." Section 5–103(g) defines the latter term:

A "customer" is a buyer or other person who causes an issuer to issue a credit. The term also includes a bank which procures issuance or confirmation on behalf of that bank's customer.

*Indeca* was not Continental's "customer" within that definition. *Indeca* did not cause Continental to issue a letter of credit. *Banco* did that. And it was *Banco* that "procure[d] . . . confirmation on behalf of that Bank's customer" Indeca.

Thus Indeca was Banco's "customer," and Banco was Continental's "customer," under Section 5–103(g). Under Section 5–109, which defines the relationship between an "issuer" and its "customer," then:

(1) Banco as issuer owed the duty of careful document examination to its customer Indeca.

(2) Continental as issuer (by virtue of UCC § 5–107(2)) owed the duty of careful document examination to its customer Banco.

Indeca cannot telescope those two contractual duties into one.

This opinion need not pause long on the provisions of UCP, which may or may not have relevance here.[8] Even if it does the conclusion is the same. UCP Article 7 provides:

Banks must examine all documents with reasonable care to ascertain that they appear on their face to be in accordance with the terms and conditions of the credit. Documents which appear on their face to be inconsistent with one another will be considered as not appearing on their face to be in accordance with the terms and conditions of the credit.

That language does not indicate to whom its contractual duty of care is owed. This Court interprets the provision consistently with the UCC, as establishing a duty of the confirming bank (Continental) only to the issuing bank (Banco) at whose instance the confirming bank actually performs a service.

### Count III—Negligence

■ Count III alleges that Continental was "grossly negligent" in accepting the RuMex documents. Continental correctly says Illinois does not recognize an action for gross negligence. *Merit Insurance Co. v. Colao*, 603 F.2d 654, 659 (7th Cir. 1979). This Court will therefore treat Count III as a simple negligence action.

Were this the typical issuing bank-confirming bank situation, an analysis much like that in the preceding section—but framed in familiar negligence law principles—would bar recovery. *Kaiserman v. Bright*, 61 Ill.App.3d 67, 73, 18 Ill.Dec. 108, 113, 377 N.E.2d 261, 266 (1st Dist. 1978) held:

[Defendant] is correct in its assertion that they will not be held liable if it is shown that plaintiffs' injuries were caused by an independent, intervening force.

Banco had an independent duty to Indeca to examine the RuMex documents, and in the usual relationship Banco might be viewed as an "independent, intervening force."

---

**7.** Indeca's memorandum tries to invoke the Hohlfeldian right-duty analysis to assert that "rights of an issuer" necessarily import correlative "duties of an issuer." That argument is analytically wrong, for the right of one party must exist only in conjunction with the corresponding duty not of the same party but of the *other* party to the jural relationship. In this case Indeca's analysis is doubly flawed for the reasons stated in the text.

**8.** UCP applies only when parties agree to adopt its provisions. While Indeca and Banco may have agreed to such adoption, Continental never agreed to abide by UCP as to Indeca.

But at least as to the forged legalization Banco was not in that position. Once the documents reached Banco the "legalization" was in place, and only Continental knew the suspicious circumstances that pointed strongly to forgery. Thus the question becomes the more conventional one whether Continental, under general tort principles, owed Indeca a duty of care.

On that score the *contractual* duty of care analysis in the preceding section is not controlling. Instead two other lines of authority lend strong support to Indeca's position.

First of these is the tort labeled negligent misrepresentation. In *Rozny v. Marnul*, 43 Ill.2d 54, 250 N.E.2d 656 (1969) the Illinois Supreme Court found a land surveyor liable for a negligent survey even though the survey was not done at plaintiff's request. It held a duty existed so long as it was reasonably foreseeable that defendant's information would be relied on. This was a pure negligence concept, with no element of scienter necessary.[9] *McAfee v. Rockford Coca-Cola Bottling Co.*, 40 Ill.App.3d 521, 526, 352 N.E.2d 50, 54 (2d Dist. 1976).

In *Rozny* terms Continental owed Indeca a limited duty. Although Banco later examined the completed documents, it was Continental that reviewed the original submission and told RuMex of the discrepancies. Continental was the only party that observed the *revision* process. To paraphrase *Rozny*, Continental represented to all who might foreseeably rely on such information that RuMex was honest in its revisions. In that respect the case comes directly within the exception expressed in *Lyons v. Christ Episcopal Church*, 71 Ill. App.3d 257, 259–60, 27 Ill.Dec. 559, 561, 389 N.E.2d 623, 625 (5th Dist. 1979). While rejecting a negligent misrepresentation action by a purchaser against a realtor, the *Lyons* Court held the realtor had no independent duty to corroborate the vendor's

representation "unless he is aware of facts which tend to indicate that such representation is false." Continental was uniquely situated to assess the revision process and thus owed a duty of care to Indeca.

Another line of cases, based more on estoppel principles than in tort, further supports Indeca's claim. In *Westlake Finance Co. v. Oak Park Motors, Inc.*, 19 Ill.2d 66, 166 N.E.2d 23 (1960) plaintiff financed a car sold by defendant. Through a series of errors, the customer sold the car after obtaining a certificate of title that failed to reflect plaintiff's lien. As the Court held (19 Ill.2d at 72, 166 N.E.2d at 26–27):

> Under such circumstances, defendant could reasonably have foreseen that plaintiff's lien might be destroyed. Regardless of whether the misstatements were intentional or were the result of mere mistake or inadvertence liability must follow, under the familiar doctrine that where one of two innocent persons must suffer, he should bear the burden whose conduct induced the loss.

*Accord, Mori v. Chicago National Bank*, 3 Ill.App.2d 49, 51, 120 N.E.2d 567, 568 (1st Dist. 1954); *Western Union Cold-Storage Co. v. Bankers National Bank*, 176 Ill. 260, 266, 52 N.E. 30, 32 (1898).

■ Those cases produce the same result as the negligent misrepresentation cases. It may well be that as to most of the alleged non-conformities, Continental did not induce or enable the fraud. But at least as to the forged legalization,[10] there is an issue of fact as to whether Continental induced or aided the fraud and should thereby be held liable.

This holding creates no tension with the UCC, which defines the duty to examine the documents on their face. On that score contract and tort theory generate the same result: A confirming bank owes no duty to the issuing bank's customer. That custom-

---

**9.** Indeca's claim does not present the issue most troubling to the *Rozny* Court, which was concerned about defendants' potential liability to an enormous unidentified class—a problem discussed in the seminal case of *Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170,

174 N.E. 441 (1931). Here Continental knew only two parties could be affected by its actions: Banco and Indeca.

**10.** See also n.4, which would appear to apply here as well.

er has a remedy against its own issuer. But as to any evidence of wrongdoing that becomes evident only in the revision process, the ultimate customer cannot look to its own issuer. There the confirming bank owes a duty to the ultimate customer as someone who might foreseeably be harmed. Accordingly Count III must stand.

### Waiver

Because two of the Complaint's three Counts survive, it is necessary to confront Continental's two theories of waiver. They can be dealt with rather simply.

Continental first contends that UCC § 5–113(2)(b) establishes a 10 day limit for a customer stating objections to documents submitted by a beneficiary.[11] Second, on September 30, 1980 Indeca signed a document that included the statement:

> We receive the documents in conformity, we accept the discrepancy(ies) and we authorize the payment to the beneficiaries.

Neither theory of waiver can bar this action. Indeca could only waive what it could have discovered. As to the legalization there is a factual issue as to whether Continental alone should have discovered the forgery. If so Indeca can not be said knowingly to have waived its right to challenge the legitimacy of the legalization.[12]

### Conclusion

Count V is legally deficient, and this Court accordingly grants Continental's motion to dismiss. But Continental's motion to dismiss or alternatively for summary judgment is denied as to Counts III and IV because they are legally sufficient and there are "genuine issues of material fact." Continental is ordered to answer the Complaint on or before February 5, 1982.

---

11. It is doubtful whether that provision even applies. By its own terms Section 5–113 applies only in circumstances not present here:
    (1) A bank seeking to obtain (whether for itself or another) honor, negotiation or reimbursement under a credit may give an indemnity to induce such honor, negotiation or reimbursement.

There is no evidence that any indemnities were given in this case.

12. Continental argues that Indeca had access to authentic stamps from the Guatemalan Consulate and should therefore have discovered the forgery. That contention serves only to raise an issue of fact.