**UNITED STATES of America, Plaintiff,**

v.

**FOSTER WHEELER CORPORATION, Foster Wheeler Limited and Manufacturers Hanover Trust Company, Defendants.**

No. 84 Civ. 2992 (KTD).

United States District Court,
S.D. New York.

July 17, 1986.

---

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for plaintiff; Alan Nisselson, Asst. U.S. Atty., of counsel.

Stephen J. Narkin, Office of Gen. Counsel, Agency for Intern. Development, Washington, D.C., Robert M. Rosenblith, New York City, for defendants; H. Jo Schneider, of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Defendant, Manufacturers Hanover Trust Company ("MHT") moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the amended complaint for failure to state a claim upon which relief can be granted, or alternatively, pursuant to Fed.R.Civ.P. 56, for summary judgment. Plaintiff, the United States Government, cross-moves for summary judgment.

This dispute arises from events surrounding an agreement between the United States Government, through its Agency for International Development ("AID"), and the Government of Bangladesh, to assist in financing the construction of a fertilizer plant in Ashuganj, Bangladesh. The defendant, MHT, was the confirming bank on a Letter of Credit issued by the Pubali Bank ("Pubali") in Dacca, India.

The gravamen of the Government's complaint is that MHT erroneously paid $216,-200.00 to a freight forwarding company, the Cargo Export Corporation ("CEC"), based on documentation that did not comply with the terms of the Letter of Credit. Specifically, AID alleges that the bill of lading was not properly marked "freight prepaid". AID reimbursed MHT for the payment to CEC and now seeks to recover the amount of the reimbursement plus a penalty of $2,000.00 and double the amount of any damages suffered by the United States. 22 U.S.C. § 2399b (1982).

## FACTS

As briefly as possible, the facts leading to this dispute are as follows. In 1975 AID and the Government of Bangladesh entered into a loan agreement, pursuant to which Bangladesh could request that AID issue Letters of Commitment guaranteeing to reimburse American banks which confirmed or made payments on Letters of Credit issued by Pubali against the account of the Ashuganj Fertilizer & Chemical Company ("AFCC"), a company owned by Bangladesh, and in favor of Foster Wheeler Limited ("FWL") the general contractor for the project, and other suppliers of commodities or commodities related services entitled to receive AID funding.

The AID Letter of Commitment was issued in May, 1977 and in June, Pubali issued a Letter of Credit in favor of FWL, which MHT confirmed. In November, MHT advised a partial transfer of the credit to CEC. The provisions of the Uniform

Customs and Practice for Documentary Credits ("UCP") were to apply to the Letter of Credit.

To receive payments under the Letter of Credit CEC was required to submit a bill of lading marked "freight prepaid", to MHT, and to certify that all conditions of the Letter of Commitment were met. The Letter of Commitment required the submission of further documentation to MHT including a Supplier's Certificate and Agreement ("Supplier's Certificate") in which the supplier was to certify that the freight had been prepaid.

In October, 1978 CEC presented several documents to MHT in connection with its request for payment under the Letter of Credit including: (1) a bill of lading dated October 17, 1978; (2) a commercial invoice for $216,200; (3) a Supplier's Certificate for CEC; and (4) a Supplier's Certificate for Intermodal Container Services, Limited, the carrier.

The center of the bill of lading contained a typed notation, "freight prepaid." At the same place, and partially overlapping the typed notation, the words "to be prepaid" were stamped. The sum of $216,045.00 was typed under a column in the left-hand corner of the document, marked "prepaid" and the column marked "collect" was empty. The commercial invoice contained a "Paid" stamp under the $216,200.00 sum listed.

Based on the documentation it received MHT paid CEC the requested sum and was reimbursed by AID for that amount. In fact, the freight bill had not been prepaid and AFCC was required to pay it before the shipper would release the goods.[1]

MHT argues that AID has no standing to sue based on the Letter of Credit and that in any case, the documents complied with the Letter of Credit requirements. MHT further argues that the Letter of Credit was not incorporated into the Letter of Commitment and that an improper payment under the Letter of Credit would not violate the terms of the Letter of Commitment. Finally, MHT argues it is not subject to suit under the False Claims Provision of the Foreign Assistance Act, 22 U.S.C. § 2399b.

## DISCUSSION

### Letter of Credit

AID claims to have standing to sue MHT on two grounds: (1) because the parties contemplated that MHT would be the issuing rather than the confirming bank on the Letter of Credit; and (2) because of MHT's contractual obligations with AID under the Letter of Commitment.

AID's first contention can be dealt with rather quickly, inasmuch as AID admits that MHT was the confirming bank in this transaction. "[T]here is no good reason to insulate MHT from liability simply because it may have served, in actuality, as a 'confirming bank.'" Government's Memo, 18. "MHT subsequently *confirmed* a Letter of Credit in favor of FWL...." Government's Statement Pursuant to Rule 3(g), ¶ 4. The fact that the Letter of Commitment also authorized MHT to issue and advise Letters of Credit, does not alter its status as the confirming bank in this instance. Thus, MHT's responsibilities and duties are those of a confirming bank.

■ A confirming bank is contractually obligated to two parties: (1) the issuing bank; and (2) the beneficiary under the Letter of Credit. *Instituto Nacional De Comercializacion Agricola v. Continental Illinois National Bank and Trust Co. of Chicago*, 530 F.Supp. 279, 282–83 (N.D.Ill. 1982) (under the Uniform Commercial Code ("UCC") and UCP confirming bank is obligated only to the issuing bank and beneficiary); *Merchants Bank of New York v.*

---

1. Not only had CEC not prepaid the freight, but it had inflated the charges and shipped the goods on vessels from Bangladesh in violation of the Supplier's Certification. *United States v. Cargo Export Corporation*, 675 F.2d 511 (2d Cir. 1982) (affirming the district court's grant of summary judgment to the United States based on CEC's false statements and breach of the Supplier's Certificate.). In addition, some of CEC's officers were convicted of receiving kickbacks from these shipments. *United States v. Ventura*, 724 F.2d 305 (2d Cir.1983).

*Credit Suisse Bank,* 585 F.Supp. 304, 308 n. 6 (S.D.N.Y.1984) (confirming bank is obligated to the beneficiary). Moreover, the contractual obligations under the Letter of Credit are wholly separate from other underlying contracts, although transactionally related to the Letter of Credit. *Dulien Steel Products, Inc. of Washington v. Bankers Trust Co.,* 298 F.2d 836, 841 (2d Cir.1962) (the contract between the buyer and seller is separate from the Letter of Credit); *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 464–65 (2d Cir. 1970).

■ To be sure, the instant case does not involve a typical Letter of Credit scenario, for there are more than the usual number of underlying contracts: (1) the loan agreement between AID and the Government of Bangladesh; (2) the Letter of Commitment between AID and MHT; (3) the buyer-seller agreement between AFCC and FWL; (4) the agreement between FWL and CEC; and (5) the Letter of Credit, part of which had been assigned from FWL to CEC. The fact that this transaction is more complicated than usual, however, does not render the general rules inapplicable.

Thus, as the confirming bank, MHT was contractually obligated to (1) Pubali, the issuing bank; and (2) CEC, the beneficiary. Either of these two parties would have standing to sue MHT for a breach of the Letter of Credit. AID offers no argument that it has somehow stepped into either of these parties' shoes and is therefore entitled to sue in their stead.[2]

**2.** In earlier litigation brought by CEC, AFCC, a defendant in the case, counterclaimed against MHT for paying CEC on the allegedly nonconforming documentation. In granting MHT's motion for summary judgment, Judge Weinstein noted that AFCC had a standing problem. *CEC v. FWL,* 80 Civ. 0512 (E.D.N.Y. March 14, 1984) order without op.

**3.** AID never argues that it has stepped into Pubali's shoes by virtue of its promise to reimburse MHT thus relieving Pubali of that responsibility. If it did so argue, however, the argument would be unpersuasive. AID's responsibility to reimburse MHT is based on the Letter of Commitment. At best, Pubali might be con-

Because AID received an assignment of all claims and causes of action from AFCC arising from any violation of AID's policies and regulations in connection with the fertilizer plant project, it is entitled to sue where AFCC could have. As an assignee, however, AID is entitled to no greater rights than its assignor would have had. *Trans-United Industries, Inc. v. Cohn,* 351 F.2d 605, 606 (2d Cir.1965). AID's status as assignee does not assist it in this case, however, as a confirming bank is not contractually obligated to the issuing bank's customer. *Almatrood v. Sallee International, Inc.,* No. 83 Civ. 1800 slip op. at 7–8 (S.D.N.Y. May 13, 1985). Nor can AID sue MHT in tort under the Letter of Credit, because the confirming bank owed no duty of care to AFCC, nor by virtue of the assignment, to AID. *Instituto Nacional* at 284.[3]

AID argues that the principles in the above cases are inapplicable because "A.I.D. had a direct contractual relationship with MHT." Government's Memo, 18. The Letter of Commitment is a separate contract and does not entitle AID to sue MHT for a breach of the Letter of Credit. Thus, AID lacks standing to sue on the Letter of Credit.

*Letter of Commitment*

■ MHT's responsibilities as stated in the Letter of Commitment and specifically regarding the bill of lading, appear to have been threefold. First, MHT was obligated to ensure that the bill of lading was properly dated. Second, MHT had to determine that the bill of lading contained the carrier's statement of charges.[4] Third, MHT

sidered a donee-beneficiary of the Letter of Commitment entitling Pubali to sue in the event of a breach of that contract. But, in no way does AID's promise to reimburse MHT in the Letter of Commitment entitle AID to stand in Pubali's shoes in a suit on the Letter of Credit.

**4.** The portion of the Letter of Commitment covering the first two points reads:

(1) Shipment. The documents submitted as evidence of the shipment of commodities shall be dated within the shipping period, if any, specified in this letter of commitment. The bill of lading shall contain the carrier's statement of charges whether or not freight is financed by AID.

was to determine that the bill of lading showed the goods were consigned to CEC.[5] The Letter of Commitment does not specifically require that the bill of lading be marked "freight prepaid."

AID argues, however, that MHT violated section 1(b)(4) of the Rights and Responsibilities of the Bank under the Letter of Commitment. This provision reads in relevant part:

> (4) Description. The documents shall describe and identify the commodities of [sic] services in a manner which, according to good commercial practice, is not inconsistent with the description contained in the letter of credit or payment instructions issued under this letter of commitment.

The dispute here, concerns a statement of the manner of payment and cannot logically be considered a description of either commodities or services falling within section 1(b)(4) of the Letter of Commitment. The payment instructions referred to are those in the Letter of Commitment not the Letter of Credit. Straining to include a statement regarding the prepayment of freight within this provision would violate the rule that language in a contract which is clear and unambiguous is to be given its ordinary meaning. *Omaha Indemnity Co. v. Johnson & Towers, Inc.,* 599 F.Supp. 215, 218 (E.D.N.Y.1984).

AID does not allege other specific violations of the Letter of Commitment, thus, unless the Letter of Credit has been incorporated into the Letter of Commitment, AID has no cause of action under the Letter of Commitment.

Aside from section 1(b)(4) of the Letter of Commitment, AID points to no other provision in the Letter of Commitment to support its incorporation argument. The reference to the Letter of Credit in section 1(b)(4) of the Letter of Commitment incorporates only those portions of the Letter of Credit describing the commodities and services. *See Lodges 743 and 1746 International Assoc. of Machinists & Aerospace Workers, AFL–CIO v. United Aircraft Corporation,* 534 F.2d 422, 441 (2d Cir. 1975) *quoting Guerini Stone Co. v. P.J. Carlin Construction Co.,* 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916). It would not, therefore, incorporate the Letter of Credit requirement that the bill of lading be marked "freight prepaid."

*Foreign Assistance Act*

AID also seeks to hold MHT responsible under 22 U.S.C. § 2399b for submitting false claims to AID for reimbursement. AID claims that had MHT exercised good business judgment, it would have known the bill of lading contained false information. MHT argues this claim must be dismissed because confirming banks are not "persons" within the meaning of the Act, and that in any case, AID would not be entitled to a refund or double damages as provided for by this section.[6]

---

**5.** The Letter of Commitment requires:
A copy or photostat of a dock receipt or warehouse receipt or ocean bill of lading showing that the commodities have been consigned to the freight forwarder, Cargo Export Corp., ....

**6.** Section 2399b reads:
(a) Any person who makes or causes to be made or presents or causes to be presented to any bank or other financial institution or to any officer, agent, or employee of any agency of the United States Government a claim for payment from funds made available under this chapter for the purposes of furnishing assistance and who knows the claim to be false, fraudulent, or fictitious or to cover a commodity or commodity-related service determined by the President to be ineligible for payment from funds made available under

this chapter, or who uses to support his claim any certification, statement, or entry on any contract, abstract, bill of lading, Government or commercial invoice, or Government form, which he knows, or in the exercise of prudent business management should know, to contain false, fraudulent, or fictitious information, or who uses or engages in any other fraudulent trick, scheme, or device for the purpose of securing or obtaining, or aiding to secure or obtain, for any person any benefit or payment from funds so made available under this chapter in connection with the negotiation, procurement, award, or performance of a contract financed with funds so made available under this chapter, and any person who enters into an agreement, combination, or conspiracy so to do, (1) shall pay to the United States an amount equal to 25 per centum of any amount thereby sought to be

The statute clearly states that the term "person" means "any individual, corporation, partnership, association, or other legal entity." 22 U.S.C. § 2399b(c). I begin with the premise that Congress intended as broad a definition of "person" as the statute indicates. *Lewis v. United States*, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980) ("in any case concerning the interpretation of a statute the 'starting point' must be the language of the statute itself.")

MHT's argument is that the inclusion of confirming banks within the purview of the statute would do violence to Congress' objectives and to AID's regulatory scheme. MHT cites to language extracted from Congressional debates on the Act which indicates that the submission of false claims by shippers and importers was foremost in Congress' considerations. The dearth of discussion regarding banks, however, is not a sufficient indicator of Congress' intent to exclude banks from the Act's coverage. More likely, it indicates that the problem of false claims had arisen most often in connection with shippers and importers, making them the most obvious topic of discussion.

wrongfully secured or obtained but not actually received, and (2) shall forfeit and refund any payment, compensation, loan, commission, or advance received as a result thereof, and (3) shall, in addition, pay to the United States for each such act (A) the sum of $2,000 and double the amount of any damage which the United States may have sustained by reason thereof, or (b) an amount equal to 50 per centum of any such payment, compensation, loan, commission, or advance so received, whichever is the greater, together with the costs of suit.

.  .  .  .  .

(c) For purposes of this section, the term "person" includes any individual, corporation, partnership, association, or other legal entity.

7. A bank's responsibilities under AID Letters of Commitment are further limited by the following excerpted provisions:

2. Limitations on the responsibilities of banks. The following general limitations on the responsibilities of banks issuing, advising, or confirming letters of credit and making payments under letters of credit or otherwise, shall apply.

Thus, MHT's strongest argument that confirming banks were not intended to fall within the Act's definition of 'person', is that it would upset AID's regulatory scheme. Congress was no doubt aware, however, of AID's regulatory scheme at the time it passed the Act.

Confirming banks under AID Letters of Commitment have extremely limited duties and liabilities for determining the truth or falsity of information provided to them by shippers and importers. For example, the Letter of Commitment provides:

2.c. Nonresponsibility of bank for truth or accuracy of statements or certifications. The bank shall not be responsible for the truth or accuracy of any information or statement contained in any Supplier's Certificate or any other document or certification to be submitted by it to AID, notwithstanding any knowledge or information in the actual or constructive possession of the bank to the contrary. The bank shall not be obligated to look beyond the documents, including any certification endorsed thereon, to be submitted by it or to make any independent investigation as to the truth or accuracy of any information or statement contained therein.[7]

a. Sufficiency and completeness of documents. Any document, including the Supplier's Certificate and the Contractor's Certificate, submitted by a bank to AID in support of a claim for reimbursement, shall be sufficient if it purports to be the sort required to be delivered and if it has been accepted by the bank in the ordinary course of business in good faith. Except as may be required in discharge of its responsibilities under subparagraphs 1.b. and 1.c. above, the bank's right of reimbursement shall not be affected by the fact that any document required to be submitted by it is incomplete or may indicate noncompliance with any provision of this letter of commitment.

.  .  .  .  .

d. Protection of bank making payment. Acceptance by the bank of any document in the ordinary course of business in good faith as being a genuine and valid document and sufficient in the premises, and the delivery thereof to AID, shall constitute full compliance by the bank with any provision of this letter commitment requiring delivery of a document of the sort that the document actually so delivered purports to be. The bank

Given such limitations it would be somewhat incongruous for a confirming bank to be subject to liability under section 2399b. Nevertheless, there are situations where a confirming bank might be in a position to willfully submit false claims to AID. *See Instituto Nacional De Comercializacion Agricola* at 284 (confirming bank was the only party in a position to know that the required legalization stamp was very likely forged).

Under section 2399b a party is liable only for claims it either knows to be false or "in the exercise of prudent business management should know" to be false. Given the extremely narrow responsibilities of confirming banks under AID Letters of Commitment, the occasions where a confirming bank should have known that a document was false will undoubtedly be extremely rare. Thus, MHT's argument that banks will not be willing to undertake to issue, confirm, or advise Letters of Credit under AID Letters of Commitment in the future, although a serious consideration, is ultimately unpersuasive.

■ Congress was aware of AID's method of operation. Had it intended to exclude banks from the statute's coverage, it could have done so directly. Thus, I find, consistent with Congressional intent, that confirming banks under AID Letters of Commitment are persons within the statutory coverage of the False Claims Act.

■ The remaining issue regarding MHT's possible liability is whether MHT should have known the bill of lading was false.[8] Although it appears very unlikely to me that the Government will be able to prevail on the merits in this case, given the limited responsibilities of confirming banks generally and the additional limitations in the Letter of Commitment, whether MHT, in the exercise of its sound business judg-

shall be entitled to receive and retain reimbursement of the amount of all payments made by it against documents so accepted.

8. AID originally argued that the bill of lading in dispute, covered a commodity-related service which was not eligible for AID funding, because the shipment was aboard a non-authorized, non-

ment, should have known the bill of lading was false raises a triable issue of fact. Thus, MHT's motion for summary judgment on the 22 U.S.C. § 2399b claim must be denied.

To summarize, AID has no standing to sue for a breach of the Letter of Credit and has failed to state a claim for breach of the Letter of Commitment. Thus, MHT's motion for summary judgment on these two issues is granted. MHT's motion for summary judgment on the False Claims Act, 22 U.S.C. § 2399b, however, must be denied as the reasonableness of MHT's conduct raises a triable issue of fact.

SO ORDERED.

United States flag ship. The Government essentially withdraws this argument, however, and states "MHT has correctly perceived ... the major thrust of the Government's claim ... is that MHT presented to A.I.D., ... a document that it should have known to be 'false, fraudulent or fictitious'."