**INSTITUTO NACIONAL DE COMERCIALIZACION AGRICOLA (INDECA), Plaintiff,**

v.

**CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY, et al., Defendants.**

**No. 81 C 1934.**

United States District Court, N.D. Illinois, E.D.

July 13, 1987.

John L. Gubbins, Chicago, Ill., for plaintiff.

Tyrone Fahner, Daniel Harris, Mayer, Brown & Platt, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This is the latest—and perhaps nearly the last—chapter in what might be termed the "Guatemalan Black Bean Caper."[1] Continental Illinois National Bank and Trust Company of Chicago ("Continental") is effectively the last remaining defendant (and very likely the only solvent one) in this action by Instituto Nacional de Comercializacion Agricola ("Indeca") stemming from a more than $5 million fraud. Indeca, as the account party on an international letter of credit, seeks to charge its losses against confirming bank Continental.

This Court's Opinion, 530 F.Supp. 279 (N.D.Ill.1982) denied Continental summary judgment on two of the three claims against it,[2] focusing entirely on the then-

---

**1.** Earlier chapters have appeared not only in this Court's opinions in this civil action (there have been a host of unpublished opinions in addition to the opinions reported at 530 F.Supp. 276 (1981), 530 F.Supp. 279 (1982) (the "Opinion"), 576 F.Supp. 985 (1983), 576 F.Supp. 991 (1983) and reconsideration of that opinion at 576 F.Supp. 1001 (1984)) but also in what has become a notorious and much-mooted criminal case (*United States v. Tucker,* 773 F.2d 136 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3338, 92 L.Ed.2d 742, *reh'g denied,* —— U.S.——, 107 S.Ct. 23, 92 L.Ed.2d 774 (1986)).

**2.** Indeca's other (breach-of-contract) claim did end with summary judgment in Continental's favor, because the Opinion, 530 F.Supp. at 282–83 held Indeca was a statutory "customer" only of its issuing bank (Banco de Guatemala ("Banco")) and not of confirming bank Continental. Though it is unnecessary to repeat the Opinion's analysis, in brief this Court held the UCC (and the Uniform Customs and Practice for Documentary Credit, "UCP," as well) creates enforceable contractual relationships only between the issuing bank and its customer (here Indeca) and between a confirming bank such as Continental and its customer (in this case Banco)—*not* directly between the buyer of the letter of credit and the confirming bank. That set of relationships has since been confirmed by our Court of Appeals in *Banque Paribas v Hamilton Indus-*

existing testimony of Continental's employee Alena Barta ("Barta") and the pro-Indeca inferences required under Fed.R.Civ.P. ("Rule") 56. After the parties had thereafter completed a great deal of additional discovery, it became clear a special Rule 42(b) hearing—one limited to the circumstances of Continental's clearance of the letter of credit—would be potentially dispositive. Accordingly such a hearing was held, after which the parties provided much-delayed post-hearing memoranda. This opinion deals at last with the issues posed by the hearing.

### Effect of the Jury

At the outset the determinations by the Rule 42(b) hearing jury, and the effect of those determinations, must be examined. Neither Indeca nor Continental filed a timely jury demand in this action in the first instance. Instead defendants Deborah Bell ("Bell"), RuMex International, Inc. ("RuMex") and Robert Tucker ("Tucker") included general jury demands in their respective Answers to the Amended Complaint.

When this Court decided to set the Rule 42(b) trial on Continental's liability for fraud or negligence or both, Continental moved for a bench trial of those issues and Bell and RuMex sought to waive their general jury demands for that purpose.[3] Indeca opposed a bench trial, and the parties briefed the issue. This Court elected to proceed with the jury, subject to a later determination as to whether the jury verdict would be binding[4] or merely advisory.[5]

That issue is not a new one for this Court. It dealt with a wholly parallel situation in *Thomson v. Jones*, 102 F.R.D. 619 (N.D.Ill.1984). *Thomson, id.* at 621 (emphasis in original) began its analysis by stating:

By their very nature jury demands cover *issues*, not *cases.*

This Court then went on to quote not only the applicable provisions of Rule 38(b) and (c) but also the applicable principle now expressed in 5 *Moore's Federal Practice* ¶ 38.40, at 38–361 (1986 ed.) (footnote omitted):

If one party has made a general demand ..., then the other parties may rely upon the demand; it includes all the issues that concern the demanding party and no other demand need be made by any party as to those issues. If the demand ... specifies the issues which the demandant wishes tried to the jury, Rule 38(c) provides that "any other party ... may serve a demand for trial by jury of any other or all of the issues of fact in the action."

As to one defendant, *Thomson, id.* analyzed the effect of his failure to demand a jury in these terms:

Though issues in Thomson's claims against Jones and Baskin (that is, whether Jones and Baskin had in fact beaten Thomson) were also involved in the later-asserted claim against DeRobertis, the gravamen of the claim against DeRobertis posed wholly new issues. Thus DeRobertis, in failing to make his own jury demand at the time he answered, could not be said to have relied on the Jones–Baskin demand to cover the principal issues affecting his liability. *Rosen v. Dick*, 639 F.2d 82, 91–92 (2d Cir.1980).

■ That language might well have been written for this case. What the Rule 42(b) hearing dealt with were the factual issues bearing on whether Continental had breached any duty to Indeca. Those issues were not at all implicated in Indeca's claims against Bell, RuMex and Tucker[6]—and

tries International, Inc., 767 F.2d 380, 384 (7th Cir.1985) (citing the Opinion with approval).

3. By that time Tucker had been dismissed as a party defendant.

4. That would be the case if Indeca had a right to a jury trial.

5. That would be the case if Indeca had no right to a jury trial.

6. Although this fact is not determinative of the matter, it is surely probative that neither Bell nor RuMex participated in the Rule 42(b) hearing, and this Court's recollection is that their counsel did not even trouble to observe the proceedings. As n. 3 reflects, Tucker was already out of the case.

they certainly were not preserved for jury consideration by the Bell, RuMex and Tucker jury demands.

Indeed, it is difficult to see how Indeca could reasonably claim to have "relied" on the jury demand by defendants other than Continental in any event. Indeca had the first opportunity to demand a jury in this case. It didn't. When Continental answered and did not file its own jury demand, Indeca still had the right under Rule 38(b) to demand a jury trial of issues relating to its claim against Continental (which were not common to its claims against other defendants). Again it didn't. That is not the stuff of which "reliance" is fashioned.

Accordingly this Court finds Indeca waived its right to a jury trial of the issues against Continental presented by the Rule 42(b) hearing (see Rule 38(d)) and has shown no good cause for its being relieved from that waiver. That means the jury convened during the Rule 42(b) hearing was no more than advisory. This Court will reflect its own findings in this opinion on that basis. Nonetheless, on the chance an upper court might disagree with this decision on the jury-demand issue, this opinion will also reflect alternative holdings on the arguendo assumption that the jury determinations were binding.

### Issues for Decision

Both Indeca's fraud claim and its negligent misrepresentation claim against Continental rest on a misrepresentation of fact characterized this way in Indeca Mem. 9:

> The relevant statement of fact here was Continental's representation that the documents which it accepted as in compliance with the letter of credit were in a form which met the requirements of the letter of credit, a representation which the jury found, in fact, to be untrue. Exhibit D.[7]

After the jury had been given carefully-crafted instructions on the legal principles applicable to Indeca's claims against Conti-

nental, it was asked not for a general verdict, but to respond to three questions shaped in that context.

After deliberation the jury returned with these answers:

> 1. Do you find by clear and convincing evidence that, in carrying out its duties as a confirming bank, Continental made a misrepresentation to INDECA knowing of the falsity of the misrepresentation at the time it was made?
>
> Answer: *No*
>
> 3. Do you find by a preponderance of the evidence that, in carrying out its duties as a confirming bank, Continental made a misrepresentation to INDECA and, if so, that Continental was negligent in determining the truth or falsity of the misrepresentation?
>
> Answer: *Yes*

It did not reach a decision as to this question:

> 2. Do you find by clear and convincing evidence that, in carrying out its duties as a confirming bank, Continental made a misrepresentation to INDECA with reckless disregard for the truth or falsity of the misrepresentation?

This opinion will approach the subject from the same three perspectives implicit in those questions posed to the jury.

### Knowledge of Falsity

 This Court shares the jury's conclusion that none of Continental's personnel had any *knowledge* of any misrepresentation made in the course of Continental's acting on the letter of credit. There was no evidence at all that could rationally support any finding that Continental's people *knew* of the forgery of the documents presented by the letter of credit beneficiary. In fact, this Court really does not understand Indeca now to contend otherwise. In any event, where such a "no evidence" situation presents itself, no specific Rule 52(a) findings of fact are really required to support the conclusion (the

---

**7.** Indeca Mem.Ex. D is Continental's telex to Banco referring to the letter of credit and stating the "documents ... presented negotiated and found in order." It is of course the phrase

"found in order" that, although itself literally truthful, implicitly contained a representation that the documents *were* "in order."

finding of "no evidence whatever" should be enough).

To the extent, then, that Indeca's right to recover must hinge on Continental's actual knowledge of infirmity of the documents tendered in purported compliance with the letter of credit, Indeca's claim must fail. This opinion turns next to the possible intermediate standard of care, as to which the jury reached no conclusion.

*Reckless Disregard for Truth or Falsity*

■ When the Opinion was written, the evidence before this Court on Continental's unsuccessful Rule 56 motion was this (530 F.Supp. at 281–82) (emphasis in original):

Indeca essentially contends that some of the documents never truly conformed and—more significant for current purposes—that the documents were so blatantly nongenuine that an inference of fraud is possible. Most serious of the discrepancies in that respect is that involving the certificate of origin, which was required to be legalized by a representative of the Guatemalan government. Alena Barta ("Barta"), Continental's employee with direct responsibility for checking the RuMex documents, first received them from RuMex representatives about 1:30 p.m. September 5 (Barta Dep. 15). Barta immediately identified and advised the RuMex people of the fact that the certificate of origin was not legalized. *Later the same afternoon* RuMex representatives brought Barta a purportedly legalized certificate of origin (Barta Dep. 54). Barta accepted that "legalization" despite the fact that the

Guatemalan Consulate is located in Miami, Florida and the newly-affixed "legalization" (consisting of a rubber stamp and *manual* signature) bore a Miami address.

Curiously enough, none of the attorneys probed the issue further at Barta's deposition. It is of course possible that a trier of fact might determine that Barta was simply (or extremely) negligent in accepting the document with a Miami stamp perhaps three hours after having rejected it for lacking that stamp. But clearly the factfinder could instead conclude that Barta had knowingly accepted a forged document.

That scenario was found sufficient to pose a "genuine issue of material fact" as to Continental's knowing acceptance of a forged document.

Now it has developed Barta was simply mistaken as to the dates: Though the *initial* presentation of documents to Continental was in fact made September 5, 1980 (a Friday), the purportedly legalized certificate of origin was retendered not that same afternoon, but rather about 11:00 a.m. September 8—the following Monday. That fact (which this Court finds from the evidence [8]) of course negates Continental's *knowing* acceptance of a forged document. But this Court also finds (an issue on which the jury reached no conclusion) Continental did not act with reckless disregard for the truth: In light of the performance reasonably to be expected of a confirming bank such as Continental,[9] its review and approval of the tendered documents (including the

8. When Barta's deposition was taken in August 1981 before Continental's summary judgment motion was made and decided, she was recuperating from major stomach surgery and was still taking post-operative medication. At the Rule 42(b) hearing several years later, Barta testified to the later September 8 date. Even more probative than her difference in recollection in her later testimony when she was not under the same stressful circumstances, her much earlier notes of February 1981 (made far closer to the event than her August 1981 deposition) also reflected the September 8 date as well. Finally, a September 8 curing of the documentary discrepancies is much more plausible in conjunction with the established September 9 payout on the letter of credit than a September 5 curing

would be. If the conspirators had gotten the forged papers in order by the end of the working day on September 5, it hardly seems likely they would have waited until September 9 to get their hands on over $5 million.

9. See the interesting discussion of the standards for banker conduct in Kozolchyk, *Is Present Letter of Credit Law Up to Its Task?*, 8 Geo. Mason U.L.Rev. 285, 319–47 (1986). This Court need not subscribe to all of Professor Kozolchyk's analysis to arrive at the decision reached in this opinion. Instead it need only adopt the unexceptionable principle stated in the next paragraph of the text.

certificate of origin) did not evidence any such reckless disregard.

What Indeca Mem. 17–18 says of the evidence—seeking to demonstrate that *Indeca* could not reasonably have known the documents were not in order when it received them—is entirely accurate:

The differences between the consular stamps on the documents received by INDECA and authentic Guatemalan consular stamps from Miami were slight and not descernible [sic] by someone not thoroughly familiar with the real seal. In particular, the number on the seal was out of sequence; there were minor differences in size and color; the Consul's signature is forged; and there is a minor difference in one abbreviation in lettering which is no more than ⅛ inch large. (Aragon Dep., p. 1382–3) What is apparent from the face of the documents received by INDECA is that a stamp is present on all documents where it is required by the letter of credit; each stamp is dated and signed; and there are no patent inconsistencies between the stamps on the various documents. The facts concerning the backdating of stamps on the substitute bill of lading and the certificate of origin were of course not known by INDECA.

Based on these facts there is no reasonable basis for concluding that INDECA should have discerned the differences between an authentic seal and those which it reviewed. There is no evidence that INDECA was familiar with the seal from the Guatemalan consulate in Miami. Moreover each Guatemalan consulate has its own procedure for consularization and seals (Aragon Dep., p. 1381), and it would be manifestly unrealistic to expect INDECA to be intimately familiar with

each seal. In the absence of such actual knowledge by INDECA, it is unreasonable to expect INDECA to recognize that the Consul's signature was a forgery or that the number of the seal was out of sequence relative to other seals affixed in Miami. And, in the absence of any evidence indicating that INDECA knew, or had any special reason to be aware, of the precise detail of this consular seal, it could not have and should not be expected to have noticed the infinitesimal differences between the forgery and an actual stamp.

But those characterizations (which this Court specifically finds to be correct) demonstrate equally that *Continental* neither knew or could reasonably have known of the irregularities either—that *it* did not recklessly disregard the truth either (and this Court specifically finds that as well).[10]

Each party offered expert testimony as to the standards of performance required of the confirming bank under the UCC and the UCS. This Court has considered and rejects the testimony of Indeca's expert, Professor Ann Lousin, in that respect. There is no question the confirming bank, such as Continental here, is not required to play detective: If it must act in a Holmesian manner at all, the nature of its duties draws more from Oliver Wendell than from Sherlock.[11] It is obligated only to place the description of documents called for in the letter of credit alongside the documents actually presented to see whether they jibe in facial terms. At least where nothing jumps out of the documents—either as they are tendered or in the very process of correcting them—to require the conclusion that they are or remain nonconforming, that marks the end of the confirming bank's obligations.

10. Indeca's discussion quoted in this paragraph of the text has focused primarily, though not exclusively, on the flaw in the certificate of origin—the same factor discussed in the earlier-quoted excerpt from the Opinion as to Barta's testimony. What is implicit in both discussions should be made explicit: Though there were also other discrepancies in the documents first presented to Barta, neither the nature of those discrepancies (either singly or in combination with each other and with the certificate of origin) nor the circumstances of their being cured

was different in kind or in degree from the types of things regularly encountered by confirming banks in clearing letters of credit. Hence the finding just stated in the text speaks of Continental's innocence of any reckless disregard in the total sense—not just as related to the certificate of origin and the consular seal.

11. See Kozolchyk, 8 Geo. Mason U.L.Rev. at 329.

Thus Indeca has swung at and missed the second strike too. It remains only to deal with the third pitch—that grounded in the negligence concept.[12]

### Negligence

■ As already indicated, the jury has found "Continental was negligent in determining the truth or falsity of the misrepresentation"—that misrepresentation being that the documents called for by the letter of credit were "in order" (that is, in compliance with the letter of credit). This Court heard the evidence too, including the testimony of the warring experts on the scope of the duty of care imposed on a confirming bank. It rejects the jury's resolution of that question of negligence vel non. Instead this Court finds the approach of Continental's expert, Professor Boris Kozolchyk, more persuasive. It finds and concludes Continental acted as a reasonable party in its situation should and would have acted—that is, this Court finds Continental to have been nonnegligent.

When Indeca's claim stemming from Continental's alleged negligence was first posed to this Court at the time of the Opinion, summary judgment in Continental's favor was rejected on a narrow ground (530 F.Supp. at 283–84):

> Were this the typical issuing bank-confirming bank situation, an analysis much like that in the preceding section—but framed in familiar negligence law principles—would bar recovery. *Kaiserman v. Bright*, 61 Ill.App.3d 67, 73, 18 Ill.Dec. 108, 113, 377 N.E.2d 261, 266 (1st Dist. 1978) held:
>
>> [Defendant] is correct in its assertion that they will not be held liable if it is shown that plaintiffs' injuries were caused by an independent, intervening force.
>
> Banco had an independent duty to Indeca to examine the RuMex documents, and in the usual relationship Banco might be

viewed as an "independent, intervening force."

But at least as to the forged legalization Banco was not in that position. Once the documents reached Banco the "legalization" was in place, and only Continental knew the suspicious circumstances that pointed strongly to forgery. Thus the question becomes the more conventional one whether Continental, under general tort principles, owed Indeca a duty of care.

On that score the *contractual* duty of care analysis in the preceding section is not controlling. Instead two other lines of authority lend strong support to Indeca's position.

Now the entire factual underpinning for that possible source of liability—liability in negligence—has been removed. Nothing in the timing of the resubmission of the certificate of origin, with what appeared to be the consular stamp properly affixed, put Continental on notice that something was amiss. Continental did *not* in fact know, any more than Banco later did, "suspicious circumstances that pointed strongly to forgery."

With the shoring thus having been taken away from any potential negligence-based liability, the structure Indeca seeks to erect on that nonexistent foundation must collapse as well. Continental is entitled to a conclusion of "no liability" on the negligent misrepresentation claim, just as it is entitled to the same conclusion on the knowledge-of-falsity and reckless-disregard claims.

Does it make any difference that the jury answered "yes" to the special interrogatory as to Continental's negligence? On this Court's earlier-stated conclusion as to the jury-demand situation discussed in this opinion, it does not (for the jury's view was purely advisory). And even on the alternative arguendo assumption that Indeca had

---

**12.** As the analysis in this section has reflected, this Court has made findings in certain respects on which the jury reached no decision. That seems plainly permissible because the issue has implicitly been tendered to this Court by both parties' post-hearing submissions. It should also be added that even apart from the analysis in the text, there is a respectable basis for arguing that Continental would have no liability to Indeca even if it *were* guilty of reckless disregard (see the Appendix).

a non-waived right to a jury determination on that question, in which event the jury's answer would have to be credited, the result would be the same.

It will be recalled that the Opinion, 530 F.Supp. at 284–85 rested (as it had to in this diversity case) on the then-existing Illinois law of negligent misrepresentation.[13] In the several years since the Opinion was issued, it has been made crystal clear that the Illinois courts limit that doctrine strictly to tortfeasors who are in the business of supplying information for the guidance of others in their business transactions (see this Court's opinion in *National Union Fire Insurance Co. v. Continental Illinois Corp.*, 654 F.Supp. 316 (N.D.Ill.1987) and Illinois cases cited there, most recently *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill.2d 146, 153, 104 Ill.Dec. 689, 692, 503 N.E.2d 246, 249 (1986)). That description simply does not fit a confirming bank in a letter of credit situation. It would be an impermissible stretch of the Illinois case law (as it has now clearly developed) to characterize Continental's business, where it serves as confirming bank in the letter of credit area, as "the business of supplying information for the guidance of others in their business transactions."

But even if that impermissible stretch could be made, Indeca must fail on the other branch of the negligent-misrepresentation tort: the identification of those with an enforceable right to rely on such information. Here the transaction is the subject of a UCC statutory definition that pre-scribes the party to whom the confirming bank owes the duty (that is, the party to whom it supplies information for guidance): to its customer (the issuing bank) and *not* to the letter of credit purchaser. All the Illinois negligent-misrepresentation cases (see, e.g., *Black, Jackson and Simmons Insurance Brokerage, Inc. v. IBM Corp.*, 109 Ill.App.3d 132, 136, 64 Ill.Dec. 730, 732, 440 N.E.2d 282, 284 (1st Dist.1982)) are careful to limit liability to the persons to whom the supplier of information owes such a duty. In other words, the very nature of the tort makes the UCC provision, which limits the party to whom the contractual duty runs, equally applicable to limit the party that can claim justifiable (and hence actionable) reliance. See *Auto Servicio San Ignacio, S.R.L. v. Compania Anonima Venezolana de Navegacion*, 765 F.2d 1306, 1308 (5th Cir.1985).[14]

Accordingly Indeca has missed the third strike as well—and that is so whether the jury's answer on the negligent-misrepresentation question is viewed as merely advisory (in which case this Court rejects it) or as binding (in which event the Illinois case law rejects it as a ground for Continental's liability). All of us know what three whiffs mean: Indeca is out as against Continental.

### Conclusion

Based on the evidence at the Rule 42(b) hearing, Indeca has failed in its efforts to impose liability on Continental. Continental is entitled to a dismissal on the merits,

---

**13.** This Court recognizes there are differing views on that score—not as to whether Illinois law provides the rules of decision here, but as to whether any tort-law theory (negligent misrepresentation or otherwise) is available to Indeca (see the Appendix). But as the text analysis will demonstrate, Indeca loses however that question is answered. Parenthetically, another non-UCC theory of Continental's liability can be quickly eliminated. On the version of the facts tendered to this Court on Continental's summary judgment motion, the Opinion, 530 F.Supp. at 284 had also hypothesized an alternative source of Continental's possible liability to Indeca, "based more on estoppel principles than in tort." But as the facts unfolded during the Rule

42(b) hearing, there is no "issue of fact as to whether Continental induced or aided the fraud and should thereby be held liable" (*id.*). Consequently that alternative possibility has dissipated and can give Indeca no comfort.

**14.** *Auto Servicio, id.* at 1308–09 referred to one article criticizing the Opinion (see the Appendix) and also opined that the Court of Appeals was "unpersuaded by [the Opinion's] reasoning." Under the circumstances, however, *Auto Servicio* simply distinguished the Opinion on the factual difference involved in the two cases. Though the Opinion must stand or fall on its own merits, the discussion in the Appendix is applicable here as well.

and it is in fact dismissed as a defendant.[15] Finally, a status conference is set for July 24, 1987 at 9 a.m. to discuss the future course (if any) of this litigation (Indeca's posthearing Mem. 4 characterized the issues resolved in this opinion as the "only unresolved claims of substance").

### Appendix

There has been some criticism of the Opinion in the literature [1] on the basis that UCC §§ 5–111(2) and 5–114(2)(b) impose on a confirming bank only warranties of honesty in fact (and hence only the duty to be honest) and that those statutory provisions impliedly displace any potential common-law obligations. At the threshold it might be observed that Continental did not argue those UCC provisions for that proposition in its summary judgment motion that generated the Opinion. But more to the point, such arguments mistake the role of this Court in every diversity case: to seek out Illinois law.

When the Opinion was written, the Illinois cause of action for negligent misrepresentation appeared to provide Indeca a viable claim of that nature against Continental, and this Court was therefore duty-bound to do precisely that. Its function was not, as is that of authors in the field, to attempt to construct a seamless web of letter-of-credit law. This Court's assigned task was and is rather to interpret and apply the law of Illinois in whatever form it exists. As this Court has frequently observed (see, e.g., Shadur, *Are Federal Courts Necessary?*, 18 Loy.U.Chi.L.J. 1, 9, 12–13 (1986), distilling the same ideas expressed in a number of opinions to the same effect) and as our Court of Appeals has recently taken to emphasizing (see, e.g., *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987) (per curiam)), a federal court is not at all free, as its state-court counterparts would be, to shape state-law doctrine—and that is particularly true in diversity cases.

Now Illinois case law has narrowed the Illinois tort of negligent misrepresentation to exclude the kind of claim Indeca advances against Continental. This Court's responsibility is to conform to that limitation, just as its prior responsibility was to uphold a cause of action the Illinois cases appeared to recognize. This opinion has been responsive to that current responsibility, just as the Opinion was responsive to the earlier one.

If the savants in the field were correct, however, it is worth observing that Indeca would be foreclosed from recovery on a reckless-disregard theory as well. That source of potential liability for Continental stems from the Illinois definition of fraud as embracing either knowing falsehood or reckless disregard for the truth. If the UCC, with its honesty-in-fact standard, really preempts *all* tort-based liability for a confirming bank in a letter of credit situation, the reckless-disregard branch of a fraud claim would fall by the wayside too.

---

**15.** Indeca's post-hearing memorandum deals with a host of issues that have become moot in light of this opinion. True enough, this opinion did choose to deal with one question that might be perceived as relevant under one view of the law but not another (the effect of the jury's determinations), but that treatment was really called for by the way the issue arose. That same thing is not true of the other questions posed by Indeca, which will not be addressed here.

**1.** Dolan, *Law of Letters of Credit* ¶¶ 6.07, at 6–39 to 6–40; 9.03[3], at 9–29 to 9–30; and 9.04, at 9–39 to 9–40 (1984); Farrar, *Letters of Credit,* 38 Bus.Law. 1169, 1166–77 (1983); and see the *Auto Servicio* decision cited in the text at n. 14: 765 F.2d at 1308 (referring to the Farrar article).