**W.A. TAYLOR & COMPANY, Plaintiff,**

v.

**GRISWOLD AND BATEMAN WAREHOUSE CO., Quality Distribution Systems, Frank Pagone, Sr., Frank Pagone, Defendants.**

No. 88 C 7133.

United States District Court,
N.D. Illinois, E.D.

July 11, 1990.

Mark A. Orloff, Brad S. Grayson, Althermer & Gray, Chicago, Ill., for plaintiff.

Paul O. Watkiss, Leahy Eisenberg & Fraenkel, Chicago, Ill., for Quality Distribution Systems defendants.

Douglas Bank, Arvey, Hodes, Costello & Burman, Chicago, Ill., for Griswold & Bateman.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

W.A. Taylor & Co. ("Taylor") has sued Griswold and Bateman Warehouse Co. ("Griswold"), Quality Distribution Systems ("Quality") and three of Quality's officers (collectively with Quality termed "Quality Defendants"), asserting claims arising from damage to Taylor's products stored at Quality's Copenhagen Warehouse in Franklin Park, Illinois (the "Warehouse"). Now both Griswold and ·Quality Defendants have independently moved for partial summary judgment, all defendants have jointly submitted a memorandum regarding the scope of the damages properly claimed under Taylor's complaint, and Taylor has moved for a formulation of issues relating to a contractual limitation of liability asserted by Quality Defendants. Having reviewed all of the various submissions relating to each of these issues, this Court:

1. grants Quality Defendants' Fed.R. Civ.P. ("Rule") 56 summary judgment motion as to Taylor's fraud-based claim in principal part (though not entirely) and grants the motion of Quality's three officers (but not Quality itself) as to Taylor's conversion claim, but denies Quality Defendants' Rule 56 motion in all other respects,

2. grants Griswold's summary judgment motion in principal part (though not entirely),

3. finds that on the record tendered to this Court Taylor may not properly include 3,474 cases of product found missing after January 1988 in its damage prayer and

4. · finds that there is an issue of fact as to whether Quality may be estopped from asserting its contractual liability limitation.

### Facts[1]

Beginning in 1982 Taylor, a distributor of various brands of alcoholic beverages and an affiliate of Hiram Walker & Sons, Inc. ("Walker"), stored its products in Griswold's Warehouse. On August 2, 1985 Walker and Griswold signed a master contract governing their overall relationship.

On August 12, 1986 Griswold President Patricia Corbett ("Corbett") wrote Taylor that Griswold would be "affiliating its Chicago operations with Quality" effective September 1 (Complaint Ex. A). In fact Griswold and Quality had entered into an agreement four days earlier (on August 8) under which Quality was to sublease the Warehouse, with a license to use the name "Griswold & Bateman of Illinois" (Complaint Ex. B). In essence that agreement effected the sale of Griswold's entire Chicago-based business to Quality and represented an effort on Griswold's part generally to terminate its warehouse activities in the Chicago area. Before mailing that letter to Taylor Corbett sent a draft of the letter to Pagone in order for him to verify the background information that it included as to Quality and the Pagones.

That change in the warehouse operation did not purport to affect the relationship with Taylor created by the 1985 Walker–Griswold contract. Six months later (February 12, 1987) Walker's Director of Administration Jim Reinhart ("Reinhart") sent Quality's president Joe Pagone ("Pagone") a formal notice that Walker intended to cancel the master contract as of May 31, 1987. That however was not intended to

---

**1.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Taylor (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987)). Major portions of this factual summary will be lifted unabashedly from this Court's July 21, 1989 opinion (the "Opinion," 719 F.Supp. 697). Citations to the Opinion will take the form "Opinion at ——," referring to the F.Supp. page number but omitting the volume number.

signal an end to the relationship. Instead it was a necessary precondition to a renegotiation of terms: Reinhart's letter also asked that Quality send Taylor a new contract and Rate Quotation for review.

In response, on February 16 Quality forwarded its proposal in Rate Quotation 00289. Taylor General Traffic Manager Jack Deckert ("Deckert") replied with a counterproposal suggesting lower storage rates. Pagone accepted the new terms and on March 3 sent Taylor Rate Quotation 00272 reflecting Taylor's proposed (and now accepted) changes. Deckert forwarded the new Rate Quotation to Taylor's Legal Department for review, then sent Pagone a Panafax stating the Legal Department required one change in the contract: Sections 3(b) and (c) (relating to transfer of goods and termination of storage) should be amended to require 30 days' advance notice by Quality. Again Quality agreed to Taylor's proposal and sent Rate Quotation 00729 reflecting that change.

Rate Quotation 00729 was thus the final contract between the parties. It contained a number of provisions now relevant:

1. Taylor's products not held in customs bond were stored at the rate of $.0715 per carton per month.

2. Taylor's products held in customs bond were stored at the rate of $.1715 per carton per month.

3. Quality's liability was limited in this manner:

Liability for loss or damage shall be limited to the actual value of the goods stored: and in no case shall the liability exceed 250 times the base storage rate unless an excess value is declared by the storer at the time the goods are stored. There will be a charge of $2/10$ of one percent per month on the excess valuation in addition to the base storage rate.[2]

Whenever Taylor shipped any goods to the Warehouse after that, it received by way of acknowledgement a warehouse receipt with this provision on the front (capitals in original):

The goods listed hereon were received in apparent good order, except as noted hereon (contents, conditions and quality unknown) subject to all terms and conditions on the reverse side hereof. Such property to be delivered to THE DEPOSITOR upon payment of all storage, handling and other charges.

The property covered by this receipt has NOT been insured by warehouse operator for the benefit of depositor against fire or any other casualty.

And this was one of the "terms and conditions on the reverse hereof" (emphasis in original)

Liability and Limitation of Damages—Sec. 11

(A) The warehouseman shall not be liable for any loss or injury to goods stored however caused unless such loss or injury resulted from the failure of the warehouseman to exercise care in regard to them as a reasonable careful man would exercise in like circumstances and warehouseman is not liable for damages which could not have been avoided by the exercise of such care.

(B) Goods are not insured by warehouseman against loss or injury however caused.

(C) The depositor declares that damages are limited to *250 times the monthly storage rate* provided, however, that such liability may at the time of acceptance of this contract as provided in Section 1 be increased in part or all of the goods hereunder in which event a monthly charge of _____ will be made in addition to the regular monthly storage charge.[3]

---

2. [Footnote by this Court] Although this provision appeared on the front of the Rate Quotation in all capital letters, it is reproduced here in more conventional (and easier to read) upper and lower case format. Its substance also reappears (in almost identical language) as Section 10(a) of the contract terms on the back of the Rate Quotation—terms explicitly incorporated as part of the agreement by another clause on the front side.

3. [Footnote by this Court] Unlike the other material on the reverse side, this provision was in all capital letters, though it has been reproduced here in upper and lower case. As can be seen it is substantially comparable (though not identical) to the previously-quoted provision of Rate Quotation 00729.

On August 13–14, 1987 the Warehouse and the surrounding area were showered with an unprecedented rainfall—9.35 inches in all during an 18–hour period. That produced up to several feet of flooding throughout the area in which the Warehouse was located. It flooded the Warehouse and caused extensive damage to Taylor's products.

On August 20 Quality notified Taylor that "we have experienced some water damage to your product," that it was in the process of checking those products and that it would notify Taylor of the results within two weeks. Taylor acknowledged receiving the letter and asked that the results of the inspection be forwarded as soon as possible.

As of November 24, 1987 Taylor still had not received a report of the damage. Only after Taylor started receiving complaints from its customers did it launch its own investigation of the damage. On January 28, 1988 Taylor and Quality conducted a physical inventory of Taylor's goods in the Warehouse. In a February 4, 1988 letter Taylor presented a written claim to Quality for 661 cases and 156 bottles of its product valued at $85,098.53. That claim demanded payment in full for those products. By way of a February 9, 1988 letter Quality denied liability for Taylor's lost products on the basis that the damages suffered resulted from an "unforseeable act of God." On August 18, 1988 Taylor filed this lawsuit seeking recovery for its damaged and lost goods.

At some time after its February 4, 1988 letter[4] Taylor, this time through a review of its own books, discovered missing what it now claims to be an additional 3,474 cases of its product, which it valued at $400,676.41, that should have been in Quality's control. Although no formal claim was ever made for those additional missing cases, Taylor seeks recovery for their loss as part of the damages in this suit.

---

**4.** Despite the potential importance of the time-of-discovery issue, Taylor has never specified (either before or in connection with the current motions) when it first learned that more than

Based on those facts Taylor's Second Amended Complaint ("Complaint") asserts four charges:

Count 1: Negligence against Quality.

Count 2: Conversion against all Quality-related defendants.

Count 3: Common law fraud against all defendants.

Count 4: Violations of Illinois' Consumer Fraud and Deceptive Practices Act (the "Illinois Act") against all defendants.

In the current spate of motions Quality Defendants move for summary judgment on Counts 2, 3 and 4; Griswold moves for summary judgment on Counts 3 and 4; together Quality Defendants and Griswold seek to limit the scope of Taylor's claim by excluding the 3,474 cases discovered missing after January 28, 1988; and Taylor moves under Rule 16(c)(1) for a formulation of issues relating to the contractual liability limitation asserted by Quality Defendants. Each of those issues will be addressed in turn.

### Quality Defendants' Summary Judgment Motion

1. Conversion

Taylor bases its conversion claim on the much-disputed proposition that in the days immediately following the flood Quality bulldozed, shovelled or otherwise destroyed Taylor's product in order to facilitate the reclamation of goods belonging to Yamaka China, admittedly Quality's largest customer. Quality Defendants counter that (1) they did not in fact bulldoze any of Taylor's product and (2) Taylor must but cannot prove that they converted Taylor property *to their own use.*

Taking the latter proposition first, Opinion at 706 made it abundantly clear that proof of garden-variety conversion does not require a showing that the alleged converter acquired the goods for its own benefit. Referring to this Court's more detailed discussion of the issue in *Refrigeration Sales Co. v. Mitchell–Jackson, Inc.,* 575 F.Supp. 971, 976–77 (N.D.Ill.1983),

the 661 cases covered by its only written notice of claim were at issue under its theories of warehouseman liability.

the Opinion noted that "conversion to one's own use" is required under Ill.Rev.Stat. ch. 26, ¶ 7–204(2) ("Section 7–204(2)") in order to avoid a contractual liability limitation in a warehouse loss situation but has no place in an ordinary, run-of-the-mill conversion action of the type alleged in Count 2.[5] Thus Taylor need do no more than establish the four basic elements of conversion under Illinois law (*Illinois Education Association v. Illinois Federation of Teachers*, 107 Ill.App.3d 686, 689, 63 Ill.Dec. 343, 346, 437 N.E.2d 1265, 1267 (4th Dist.1982)):

> (1) unauthorized and wrongful assumption of control, dominion, or ownership over the personal property of another;
> (2) the plaintiff's right to the property;
> (3) his absolute and unconditional right to immediate possession of the property; and. (4) a demand for possession.

■ As for Quality's contention that it did not bulldoze, shovel or otherwise destroy any of Taylor's property, that presents a classic factual issue. Taylor easily points to enough evidence to allow a factfinder to determine that Quality (that is, the corporation through its employees) destroyed Taylor's property in an attempt to clear the Warehouse speedily:

> 1. Joe Pagone's affidavit ¶ 21 states that as of a week after the flood "the most damaged product found at the bottom of the piles, had been carried or shovelled into trailers which were on hand at Quality."
> 2. Quality's own documentation for its insurance claim (Taylor Ex. O) indicates that during the week of August 13–17, 1987 it had two forklift operators working for a total of 107.5 hours moving and disposing of goods at the Warehouse.

Quality Defendants counter by pointing to the affidavits of Joe Pagone ("Pagone"), Frank Pagone and Frank Pagone Jr., each of whom says he did not personally damage, destroy, sell, give away, distribute or bulldoze any of Taylor's product in storage at the Warehouse. Those affidavits also specifically deny that the affiants instructed any Quality employee to undertake any such activity or that any employee in fact did so.

That showing sufficiently negates any *individual* involvement of any of the three named officers to insulate all of them from personal liability for a tort claim such as conversion. Nothing advanced by Taylor suffices, even with the required reasonable inferences in Taylor's favor, to generate a material factual issue on that score. That entitles the three individuals to extricate themselves from that aspect of this lawsuit.

But obviously the conflicting evidence as to Quality and what its other employees did makes summary judgment for *Quality* inappropriate in this setting. Quality attempts to avoid that inevitable result by urging that Deckert's deposition testimony bars Taylor from asserting that any product damage occurred at Quality's hands. Deckert testified (Quality Mem. Ex. 1):

> Q. So then you don't have knowledge as to whether or not Taylor product was damaged further during recuperation efforts, do you?
> A. I have no first hand knowledge in my inspection, however, the manner that product was stored during the entire process was incorrect, because, you know, it had sat there so long.

Quality Mem. 3 (citing *Hansen v. Ruby Construction Co.*, 155 Ill.App.3d 475, 108 Ill.Dec. 140, 508 N.E.2d 301 (1st Dist.1987)) maintains that "[t]his testimony constitutes a binding judicial admission, and therefore, the Plaintiff cannot contradict this admission by adopting inconsistent evidence."

That notion is wholly unpersuasive for two reasons. First, *Hansen* is an Illinois case discussing Illinois procedural rules governing summary judgment motions and *not* Rule 56, which of course sets the relevant standards in this context.[6] Second

---

5. Because a showing of conversion *to Quality Defendants' own use* is unnecessary in this situation, there is no need to decide whether Quality's claimed intentional bulldozing of Taylor's product, if carried out to service Yamaka better, would amount to conversion for "one's own use."

6. If instead the Illinois rule were viewed as one of evidence, again the operative standards would be those of federal and not state law—this time the Federal Rules of Evidence.

and in substantive terms, the mere fact that *Deckert* did not have personal knowledge of any product destruction or how it might have occurred does not and could not amount to a flat negation of such occurrence by Taylor, sufficient to bar it from offering other evidence of such destruction.

In sum, there is a genuine issue of fact as to whether Quality (as contrasted with its officers individually) took any action inconsistent with Taylor's ownership of its product stored at the Warehouse so as to support Count 2's conversion claim. That claim withstands summary judgment.

## 2. Fraud-based Claims

■ Complaint Count 3 alleges that Quality Defendants fraudulently made false representations regarding both their relationship with Griswold and their actions following the flood that resulted in damage to Taylor's product. Quality Defendants have moved for summary judgment, urging that (1) *they* did not misrepresent their relationship with Griswold and (2) none of the allegedly fraudulent conduct proximately caused Taylor's damage.

*Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980) sets out the elements of common law fraud under Illinois law:

> (1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.

Quality Defendants' first objection—that Taylor and *not* Quality was responsible for the misrepresentation of their relationship—is readily dispatched. Quality's Answer ¶ 33 admitted that Pagone was aware of Corbett's letter before it was sent. Corbett corroborated that by testifying (1) that before she sent the letter to Taylor she sent a draft of the proposed letter to Pagone and asked him if he would review the facts about himself and his business and (2) that he then told her the information she had was correct (Corbett Dep. 6–7). While that evidence does not suggest that Quality took a lead role in formulating the misleading letter, it does indicate that Quality and Pagone knew of the letter's misrepresentations and did nothing to clear them up.[7] That fact, coupled with the obvious financial interest that Quality had in the success of the misrepresentation (the continuation of Taylor's business with Quality after the sale), could permit a factfinder to determine that Quality and Pagone had knowingly participated in the misrepresentation of a material fact with the intention that Taylor rely on the misrepresentation.[8]

Quality Mem. 8, however, contends that the *only* way any of Quality Defendants could be held responsible for Corbett's letter would be upon a showing of an agency relationship between Quality and Griswold—a relationship they rightfully deny. But that contention had falsely assumed that Taylor would adduce no direct evidence of Quality's (or any individual defendant's) knowledge or approval of the letter itself. Nothing in this analysis suggests that this Court actually finds at this point that Quality did in fact participate in misrepresenting the nature of its relationship with Griswold from Taylor—rather it merely recognizes that Taylor has pointed to

---

7. That may be treated as the equivalent of a direct misrepresentation under Illinois law (see, e.g., *Instituto Nacional de Comercializacion Agricola (Indeca) v. Continental Illinois Bank and Trust Co. of Chicago*, 530 F.Supp. 279, 281 (N.D. Ill.1981) and cases cited there). Such treatment obviates any need to review the more troublesome issue of whether Illinois law (like the federal securities laws) treats a *nondisclosure* as the basis for a common law fraud claim, absent a fiduciary relationship or some other special source of an affirmative *duty* to disclose (see, e.g., *Bonfield v. AAMCO Transmissions, Inc.*, 708 F.Supp. 867, 886 (N.D.Ill.1989)).

8. Once more the parties have not been attentive enough to the need for individualized scrutiny of Taylor's claims, especially those sounding in tort. Evidence of Pagone's involvement may surely be taken as implicating Quality as well, but absent any further showing it cannot be laid at the doorsteps of the other two individual defendants. That alone would cause those defendants to be dismissed from the fraud claim on the facts before this Court. As the ensuing discussion reflects, however, all defendants are entitled to prevail on that claim on other grounds in all events.

enough evidence to preclude summary judgment on the issue.

 Quality Defendants' next argument really presents the central question of this entire case: What was the cause of Taylor's injury? They maintain that neither the representation that Quality was "affiliating" with Griswold nor its allegedly fraudulent conduct after the August 14, 1987 flood[9] caused any injury to Taylor. Taylor retorts by urging that absent the fraud it would not have stored its goods with Quality, so that its goods would not have been present in the Warehouse when the flood occurred. Alternatively Taylor claims that had it known that Quality was separate from Griswold and did not intend to honor the Griswold practice of paying all claims in full (despite the contractual liability limitation), Taylor would have taken precautions either by negotiating directly with Quality for more extensive coverage or by obtaining outside insurance. In either event the theory is that had it known the truth Taylor would have done something differently, and that different conduct would have prevented it from suffering the current loss either entirely or to some degree.

It is of course possible that in some other legal system than our own, Taylor's suggested approach to the "If I knew then what I know now ..." scenario would be the one by which a defrauded party's damages would be measured. When such cases as *Soules* speak of "action by the other party [the one to whom the false statement is made] in reliance on the truth of the statement," such "reliance" might arguably be framed in terms of the defrauded party's not having adopted some different course of conduct.

But the short answer is that such is *not* the law in Illinois (which provides the substantive rules of decision in this diversity case). Whether because such an approach would allow a party to create a factual construct with the benefit of hindsight that would be difficult if not impossible to penetrate in the way normally done in litigation—by a showing that the available objective evidence does not jibe with the party's present version of its earlier-existing intention or state of mind[10]—or for other reasons, Illinois law instead adopts a "benefit of the bargain" rule. It looks at the position that the defrauded party would have been in if the false statement had been *true*. *Martin v. Allstate Insurance Co.,* 92 Ill.App.3d 829, 835, 48 Ill.Dec. 316, 321, 416 N.E.2d 347, 352 (1st Dist.1981) stands squarely for that proposition.[11]

From that perspective Taylor's entire superstructure—erected as it is on a false premise—collapses. To be sure, the cases do not always articulate matters as clearly as *Martin* and like decisions do.[12] Often

9. Complaint ¶ 23(a)–(k) sets forth the allegedly false representations made by Quality after the flood upon which the common law fraud claim is, in part, based.

10. Almost by definition there can be no objective evidence to indicate what a party's hypothetical course of conduct would have been under a set of circumstances that never existed. And just how is it possible to conduct an effective cross-examination of a witness who asserts, without any support other than his or her own say-so, "If I had known that Quality had bought the warehouse business from Griswold rather than their having joined forces, I would have done thus-and-so"?

11. Frequently (perhaps most frequently) no difference would flow from the adoption of Taylor's contention rather than the one that Illinois law follows. Assume for example a securities fraud in which the misrepresentations cause shares of stock actually worth $10,000 to seem worth $100,000 to the purchaser, who buys them for that higher price in reliance on the misrepresentations. On the principle that Illi-

nois law follows—providing the investor with the benefit of the bargain by measuring his, her or its recovery in terms of what damages were suffered by looking at what the situation would be if the statement had been true—the recoverable damages would be $90,000 ($100,000 in value if the representations were truthful, less the $10,000 in value actually received). On the Taylor-urged approach, the investor says "If I had known the truth I wouldn't have made the investment"—and again the damages would be $90,000, because the fraud-induced investment involved paying $100,000 for $10,000 worth of stock. But the fact that the impermissible "If I knew then ..." approach may thus produce the same result in *some* situations as the path that is actually taken by the law does not validate Taylor's approach as such.

12. *General Motors Acceptance Corp. v. Central National Bank,* 773 F.2d 771, 781–82 (7th Cir. 1985) might perhaps be read as an acceptance of the "If I knew then what I know now ..." theory espoused by Taylor. But three points should be made in that respect:

they discuss this principle of limiting recoverable damages by requiring that the damages be "proximately caused" by the alleged fraud. In that respect *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 686 (7th Cir.1990) observes perceptively:

> This unfortunate bit of legal jargon ["proximate cause"] is used to cut off liability, for a variety of special reasons, for harms caused by the defendant's conduct in the ordinary-language sense of "caused."

Thus *Martin* itself (92 Ill.App.3d at 835, 48 Ill.Dec. at 321, 416 N.E.2d at 352, citing 19 I.L.P. *Fraud* § 54) also announces its result by saying that damages "must be a proximate, and not a remote, consequence of the fraud."

In those terms *Parvin v. Sill*, 138 Ill. App.3d 325, 328, 93 Ill.Dec. 161, 163, 486 N.E.2d 262, 264 (5th Dist.1985) repeats the common proposition that Illinois courts ordinarily treat proximate causation as an issue of fact for jury determination (see also *Hylin v. United States*, 715 F.2d 1206, 1214–15 (7th Cir.1983), collecting cases). But "ordinarily" does not mean "always," and *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 318, 45 N.E.2d 665, 675 (1942) holds that proximate cause can be a question of law "when the facts are not only undisputed but are also such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them." This is precisely such a case.

Taylor's claim hinges on the fact that "but for" the fraud it would not have had its product stored in the Warehouse when the flood hit. But *Merlo, id.* at 317–18, 45 N.E.2d at 675 specifically held that setting the stage for *something else* to act and cause an injury opens one up to liability for the ultimate injury only when "the first wrongdoer might have reasonably anticipated the intervening cause as a natural and probable result" of its own actions.[13] This Court finds as a matter of law that the unprecedented rainfall that occasioned the flood, and the flood itself, were simply not reasonably foreseeable so as to make Taylor's loss a natural and probable result of Quality's assumed wrongful inducement to choose the Warehouse as a storage facility. Prosser and Keeton on the Law of Torts § 44, at 312 (5th ed. 1984) teaches that while a defendant is required to anticipate the usual weather of the vicinity, "the defendant is not liable for the result of unforeseeable, abnormal forces of nature, such as unpredictable storms or floods."

Furthermore, the alleged Quality negligence in the wake of the flood is causally removed even one step further from the underlying fraud: Griswold's assertedly misleading letter set the stage for the products to be in the Warehouse when the flood hit, and the flood set the stage for Quality to be negligent in cleaning things up. And Christopher Columbus set the stage for the parties to conduct business on this continent—shall we hale his descendants into

---

1. From a reading of the *GMAC* opinion it is clear that the Court of Appeals there found the misrepresentations at issue were *so* closely connected to the damages caused so as to justify a determination of proximate causation to support liability (see discussion immediately following in text).

2. Nothing in the *GMAC* discussion suggests that the court was presented with (let alone actually decided) the question whether Illinois law (as exemplified by *Martin* and other cases) calls for the benefit-of-the-bargain approach just described in the text or whether such an approach would have supported the claimed damages in any event. Indeed, for aught that appears GMAC's damages recovery *did* measure the difference between the financial position that it would have been in if the defendant Bank had been telling the truth and the position that it ended

up in when the Bank turned out to have lied and GMAC's borrower collapsed.

3. In any event, of course, Illinois law is what the Illinois courts say it is—not necessarily what federal courts may say about it (see, e.g., *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 569–71 (7th Cir. 1985)), acknowledging the Court of Appeals' misapprehension over a score of years of the Illinois piercing-the-corporate-veil doctrine as taught by the Illinois cases themselves).

**13.** That principle, as applied in the context of this case, is really the tort equivalent of the familiar *Hadley v. Baxendale* limitation on breach-of-contract damages (see, e.g., *Rardin v. T & D Machine Handling, Inc.*, 890 F.2d 24, 26–27 (7th Cir.1989), confirming the applicability of the identical doctrine under Illinois tort law).

court as well? All sarcasm aside, at some point the law simply must say that enough is enough. Just last month the Supreme Court commented on this very issue in *Cooter and Gell v. Hartmarx,* —— U.S. ——, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990), quoting Prosser and Keeton § 41, at 264:

> In a philosophical sense, the consequences of an act go forward to eternity.... As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability.

And *Bastian,* 892 F.2d at 683–86 has recently delivered the same message when discussing "loss causation" in the federal securities law context. Lest it be thought that borrowing from that specialized legal area is inappropriate in this setting, *Bastian, id.* at 683–84 (emphasis in original, case citations omitted) clearly universalized that message:

> Indeed what securities lawyers call "loss causation" *is* the standard common law fraud rule (on which see Prosser and Keeton on the Law of Torts § 110, at p. 767 (5th ed. 1984)), merely borrowed for use in federal securities fraud cases. It is more fundamental still; it is an instance of the common law's universal requirement that the tort plaintiff prove causation. No hurt, no tort.

In *Bastian* the defendants' fraudulent misrepresentations induced plaintiffs to invest in the oil and gas industry, and the subsequent collapse of oil prices wiped out the plaintiffs' investment. On those facts plaintiffs proffered an argument almost identical to Taylor's in this case (*id.* at 683):

> The plaintiffs argue that they should not be required to allege that, but for the circumstances that the fraud concealed, the investment they were induced by the fraud to make would not have lost its value. They say it should be enough that they would not have invested but for the fraud; for if they had not invested, they would not have lost their money, and the fraud was therefore the cause of their loss. They say they have no idea why their investment was wiped out and

it does not matter; the defendants, being responsible for the disaster by having used fraud to induce the investment, must not be allowed to get off scot-free just because the plaintiffs do not know how the investment would have fared in the marketplace had the facts about the defendants' competence and integrity been as represented. As a fallback position the plaintiffs argue that the defendants should have the burden of proving what part (if any) of the loss would have occurred if the defendants had been as competent and honest as represented.

Like the plaintiffs in *Bastian,* Taylor has neither attempted to show nor (obviously) succeeded in showing that if things had been as represented—if Griswold had been affiliated with Quality—it would not have suffered its loss. True enough, Taylor has alleged that Griswold had more experience in the warehouse business than Quality and enjoyed a reputation for good service that Quality did not—but that does not reasonably carry the inference that Griswold would have been able to prevent or even to minimize the damage caused by the flood had it in fact been affiliated with the Quality operation. No evidence suggests that the flood could have been anticipated by a company with more experience, or that under Griswold's management the Warehouse was in a state of readiness to combat the flood waters—a readiness that somehow deteriorated when Quality took over.

Taylor objects that such an approach assumes away the controlling issue of whether Quality was negligent in its efforts to deal with the flood. But that inquiry is really not relevant here. In the absence of a showing that due care by a warehouseman could have prevented flood damage, no link between the alleged fraud and the injury has been established. Taylor conveniently ignores that Illinois law requires that damages resulting from fraud must be definite and *not* speculative and that the fraud must be a direct and *not* a remote cause of that damage (*Martin,* 92 Ill. App.3d at 835, 48 Ill.Dec. at 321, 416 N.E.2d at 352). Taylor's theory impermissibly speculates (1) that Quality had a duty to take action, other than what it took, that

would have avoided or reduced the damage *and* (2) that had Griswold been involved, such other action would have been taken *and* would have been effective. Even assuming Quality's negligence, if the flood would have ruined the property anyway such negligence simply does not matter to the fraud claim.

Taylor's second contention—that if Griswold had been affiliated with Quality, Taylor would have received full coverage for its losses as a matter of course notwithstanding the contractual liability limitation—also fails to persuade as to the flood-caused losses. While Taylor has clearly established that each time it had previously lost property stored with Griswold it had been reimbursed in full, that fact really has no probative force in this situation. Each of those previous losses had been discovered in inventory reconciliations and could not be attributed to any discernible force other than Griswold's carelessness or employee pilferage. Never before August 1987 had Taylor suffered a casualty loss in connection with property stored with Griswold. Given those circumstances, it is entirely fallacious to assume—or to phrase matters in Rule 56 terms, it is unreasonable to draw any inference—that Griswold's historic willingness to compensate claims for inexplicable losses would translate into a willingness to exceed its contractual obligations where natural forces, admittedly beyond its control, occasioned the loss in question. Taylor has offered no evidence of any other occasion on which Griswold fully reimbursed any of its clients for losses due to an unforeseeable act of nature. Thus nothing but mere conjecture supports Taylor's assertion that if things had been as they were represented, it would have collected the full amount of its loss despite the contractual liability limitation.

■ But to the extent that Taylor is seeking damages for non-flood-related damage—simple loss or employee pilferage attributable to Quality's negligence—there remains a factual issue as to whether, had things been as represented, Taylor would

have been able to collect the full amount of its loss despite the contractual liability limitation. Admittedly Griswold had fully compensated for that type of loss in the past, and a factfinder might reasonably determine that if Quality and Griswold had been affiliated that practice would have been continued.

Hence it may be that the difference between (1) the full value of the products lost through such causes other than the flood and (2) the lesser amount that will be reimbursed under the contractual liability limitation could be found by a jury to be damages directly ("proximately") caused by the alleged fraud. Because there is a disputed factual issue as to what would have happened as to the honoring of such losses had the misrepresentations as to the Quality–Griswold relationship been true, summary judgment is inappropriate and Quality's motion is denied in that limited respect.[14]

■ Slightly different issues are presented by the second set of misrepresentations underlying Taylor's fraud claim against Quality Defendants—those relating to Quality's report of action taken following the flood. Here Taylor essentially maintains that Quality actively misrepresented or concealed its post-flood activities so that Taylor (1) would not be aware of the extent of the damage to its property and of the ineptitude of the recovery efforts and (2) would therefore continue to store its product at the Warehouse. That argument boils down to an accusation that because Quality did not inform Taylor of its negligence it committed a fraud, and that as a result Taylor was harmed by the underlying negligence. If that sounds confusingly circular, there is a very good reason: It is. It seeks to convert a negligence action into a fraud claim because the allegedly negligent party attempts to coverup the negligence after it has occurred.

But Taylor's argument on that score identifies no Illinois cases supporting its theory. Complaint ¶ 23(a)–(k) simply provides a laundry list of allegations that go

---

**14.** As the later text discussion will reflect, that denial applies only to such losses included with- in Taylor's 661-case claim.

directly to the existence of and apparent effort to hide negligence—it does not support an independent action for fraud. If Taylor is advocating the recognition of a new type of fraud claim—at least new for Illinois—based on a negligence cover up scheme, it has come to the wrong place. Consistent reminders from our Court of Appeals—cases such as *Gust K. Newberg Construction Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987) and *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370 (7th Cir.1985)—teach that respect for the role of state courts as the principal expositors of state law counsels against this (or any) federal court taking so bold a step in an area in which those state courts have the primary responsibility for and interest in the development of the law.

■ Complaint Count 4, charging violation of the Illinois Act, is doomed to the same fate as Count 3's common law fraud claim. There are to be sure respects in which the elements of proof differ in the two actions. *Bandura v. Orkin Exterminating Co.*, 865 F.2d 816, 820 (7th Cir.1988) (citations omitted) says accurately enough:

> The Illinois courts have consistently recognized that a cause of action based on common law fraud and a cause of action under the ICFDPA are entirely separate.

But both causes of action require an *identical* showing of proximate cause. *Petrauskas v. Wexenthaller Realty Management, Inc.*, 186 Ill.App.3d 820, 832, 134 Ill.Dec. 556, 563, 542 N.E.2d 902, 909 (1st Dist.1989) (citations omitted) teaches:

> A plaintiff can recover damages under the Consumer Fraud and Deceptive Business Practices Act only when his injury is a direct a proximate result of an alleged violation of the act.... The question of whether proximate cause existed is generally one of fact, however, "[a] defendant may escape liability by demonstrating that the intervening event was unforeseeable as a matter of law."

Given the common element of causation in the two claims, what has already been said as to Taylor's failure to create the reasonable inference that the bulk of its injuries were proximately caused by the alleged fraud also serves to derail Count 4's Illinois Act claim to the same extent.

Thus with a limited partial exception, Taylor has not established a genuine factual issue as to whether the alleged fraudulent misrepresentation proximately caused Taylor's harm. Quality Defendants' motion for summary judgment on Counts 2 and 3 is granted except to the extent of any losses paralleling those previously honored by Griswold despite the contractual limitation on liability.

### Griswold's Summary Judgment Motion

Griswold's summary judgment motion on Counts 3 and 4 involves precisely the issues that have just been explored at such length. Its motion too is granted except to the extent just indicated.

### Permissible Scope of Taylor's Claim

■ Included in the parties' Final Pretrial Order ("FPTO") entered by this Court on January 29, 1990 was Taylor's damage summary, which reflected a claim for 3,474 cases of inventory discovered missing after January 28, 1988 and valued at $400,676.41 (J.Mem.Ex. D and E). In response Quality defendants incorporated the following statement into the FPTO:

> The Defendant also disputes that the plaintiff is entitled to make a claim for product which is not the subject matter of the plaintiff's Complaint. The plaintiff is improperly attempting to amend its Complaint to seek damages for 3,474 cases of goods. At no time prior to this Pretrial Order has the plaintiff ever made this claim for the loss of these products. The claim for these products constitute [sic] a separate cause of action which is not the subject matter of the plaintiff's Complaint.

Now both sides have submitted cross-memoranda on the question whether damages ascribable to those cases are properly part of the current lawsuit.

D. Joint Mem. 10 claims that "[i]f this Court will allow the Plaintiff to include these 3,474 cases in this lawsuit, it would be impermissibly permitting the Plaintiff to amend its complaint and to circumvent the

terms and conditions of the storage contract and warehouse receipts." While that certainly represents a partial overstatement of the matter, Taylor's dramatically enlarged ad damnum was indeed advanced at a time, in a manner and under circumstances that require Taylor's being barred from including the additional cases in this lawsuit.

It is true that Complaint ¶ 15 specifically refers to the loss or theft of products delivered to the Warehouse after the August 1987 flood. It also says that the January 1988 physical inventory revealed those losses. And at least arguably the thrust of the allegation is somewhat broader: that Taylor's damages were not limited to losses incurred during and immediately following the flood, but also extended to losses caused by non-flood-related negligence. In the same vein, Complaint ¶ 17(f) also specifically alleges that Quality was negligent when

[I]t failed to take precautions to prevent substantial amounts of Taylor's product from being lost or stolen.

Again Taylor could contend in good faith that the allegation encompasses no express or implied limitation that would limit its claim only to results of that negligence discovered before January 28, 1988. Finally, Taylor's prayer for damages in Count I ¶ 18 states (emphasis added):

As a direct and proximate result of Quality's negligence, Taylor suffered substantial damage. *Though the precise amount of that damage is not currently known,* it is known that over $42,000 of Taylor's product was destroyed, over $60,000 of its product was missing or stolen ...

Thus the Complaint does leave open the amount of damages and at least arguably does not explicitly limit Taylor's claim to losses discovered in the January 1988 physical inventory. But the Complaint is far from clear on the source-of-damages issue—while the possibility of damages other than those disclosed in the physical inventory was not explicitly foreclosed, that prospect was likewise not expressly included. And even more critically for current purposes, Taylor thereafter utterly *failed* (1) to file a written claim for any additional

losses and (2) to respond to discovery requests directly addressed to that issue. That double failure is fatal to its current attempt to include the 3,474 cases in its damage claim.

Defendants correctly assert that Taylor's failure to lodge a written claim for any such losses in advance of the filing of this suit bars it from claiming those losses now. Defendants rely on express language in the storage contract and the warehouse receipts to establish that Taylor had an absolute obligation to make a seasonable written claim as a prerequisite to filing suit. In that respect Section 12 of the warehouse receipts provides (emphasis added):

NOTICE OF CLAIM AND FILING OF SUIT

(a) *Claims by the depositor and all other persons must be presented in writing to the warehouseman within a reasonable time,* and in no event longer than either 60 days after delivery of the goods by the warehouseman or 60 days after the depositor of record or the last known holder of a negotiable warehouse receipt is notified by the warehouseman that loss or injury to part or all of the goods had occurred, which ever time is shorter.

(b) *No action may be maintained by the depositor or others against the warehouseman for loss or injury to the goods stored unless timely written claim has been given as provided in paragraph (a) of this section* and unless such action is commenced either within 9 months after date of delivery by warehouseman or within 9 months after depositor of record or the last known holder of a negotiable warehouse receipt is notified that loss or injury to part or all of the goods has occurred, whichever time is shorter.

(c) When goods have not been delivered, notice may be given of known loss or injury to the goods by mailing of a registered or certified letter to the depositor of record or to that last known holder of a negotiable warehouse receipt. Time limitations for presentation of claims in writing and maintaining an action after

such notice begin on the date of mailing of such notice by warehouseman.[15]

Taylor's obligation to notify the warehouseman of a claim "within a reasonable time," and to do so *before* filing suit, is absolute. It is true that where, as here, a formal notice of loss was never tendered by the warehouseman and the losses were discovered by the complaining party's own investigation, the time clocks specifically mentioned in the quoted provisions [16] never began to tick so as to define the particularized outside limits for "a reasonable time." But the express language of Section 12(a)'s opening clause (emphasized above) mandated Taylor's duty to file a claim before it could bring a lawsuit (which latter condition is expressly imposed by the flat prohibition emphasized above in the opening clause of Section 12(b)). When Taylor discovered that its losses far exceeded the 661 cases originally claimed in its February 4, 1988 letter, it had an unequivocal contractual obligation to inform Quality in writing —"within a reasonable time"—of at least the extent of those claimed further losses and its intent to seek damages for that expanded loss.[17] Absent such notification, this lawsuit was limited to damages caused by flood and any other losses discovered in the January physical inventory—the things that had been specified in Taylor's February 4, 1988 letter making a "formal claim for the discovered shortage" to Quality.

And that failure to make any further claim before filing this suit, fatal in contractual terms to Taylor's right to pursue this action, is exacerbated by Taylor's non-responsiveness to defendants' discovery efforts on that very subject. In the course of discovery defendants presented Taylor with the following production request:

15. All documents reflecting, referring and/or relating to Plaintiff's damages including, but not limited to the cost of production and/or landed cost of the product alleged to have been destroyed, the cost of production and/or landed cost of production alleged to be missing or stolen, the cost incurred by Plaintiff to repack, reclaim and/or replace product, the value of the liquor tax drawbacks which plaintiff alleges it lost, documents related to the cancellations or cutbacks on special pack Christmas season promotions, and any other documents relating to Plaintiff's alleged damages.

Taylor responded:

15. Plaintiff objects to this request on the ground that it is overbroad, seeks documents not relevant to the subject matter of the lawsuit or reasonably calculated to lead to discovery of admissible evidence, and, as a result, unduly burdensome. Subject to this objection, Plaintiff will produce documents in its possession, custody or control which verify its damages claimed.

Defendants' Interrogatory 3 also addressed the issue specifically:

3. With respect to the shortage of product alleged to have been delivered after the August 1987 flooding, state the following:

a. the type, model, lot number, any other identifying information and quantity of product;

b. the date the product was delivered to Defendants;

---

**15.** [Footnote by this Court] Those provisions are more detailed and precise than the considerably shorter paragraph in the 1987 storage contract:

Claims by the depositor must be presented in writing within a reasonable time, and in no event longer than 60 days after delivery of the goods. No action may be maintained by the depositor against the warehouseman for loss or damage to goods covered hereunder unless commenced within 9 months after date of delivery by the warehouseman.

This opinion will analyze the issues in terms of the more comprehensive agreement between the parties as embodied in the warehouse receipts.

**16.** Those time clocks are stated in the unemphasized portions of the just-quoted Sections 12(a) and 12(b).

**17.** Given Taylor's total failure to give any notice at all suggesting such an enlarged claim, it is unnecessary to decide now whether the requirement of a "written claim" included any other information, such as a more precise statement of the nature of the newly-asserted losses and how they were discovered.

c. by whom the product was delivered.

Taylor responded only:

3. Pursuant to Rule 33(c) of the Federal Rules of Civil Procedure, Plaintiff will produce documents from which the information sought by this interrogatory may be obtained.

Despite those responses and its express promises to identify such claimed losses (if there were any), Taylor *never* produced any documents responsive to the quoted discovery requests. Not until February 1990, well after the December 15, 1989 close of discovery date, did Taylor produce the underlying documents in support of its FPTO damage summary, including the additional 3,474 cases of assertedly missing product. Quite apart from Taylor's contractual delinquency, any such fast and loose approach to the litigant's obligations to avoid, where possible, the presentation of new and surprising claims at advanced stages of the litigation process (an outcome that the discovery rules were designed to forestall) could not be countenanced by this Court.

Any possible dispute as to whether (as defendants urge and Taylor stoutly denies) the newly asserted damages amount to an impermissible amendment to the Complaint drops out of the analysis—except perhaps to the extent that Taylor might contend that it has *now* given a proper claim in writing (presumably its FPTO damage summary would fill the bill in that respect) and that it is therefore *now* entitled to "maintain an action" on that claim as warehouse receipts Section 12(c) would allow (presumably by a post-claim amendment to the Complaint). Strictly speaking, any such possible contention is not now before this Court. But it is certainly worth emphasizing, consistently with the just-completed analysis, that Taylor's burden of establishing that such an enlarged claim was "presented in writing to the warehousemen within a reasonable time" (a "timely written claim," as Section 12(c) puts it) would have to be evaluated against the backdrop of Taylor's total silence between the March 1988 filing of this action and its February 1990 initial mention of such a claim in the FPTO. And again that silence would itself have to be evaluated against the backdrop of the long-pending discovery requests to which Taylor made no real response at all.

Those questions, however, are not posed now despite the imminence of trial. For now this Court must deny Taylor's effort to transmute 661 cases into 4,135 cases for damage purposes.

*Contractual Liability Limitation*

■ Taylor's Rule 16(c) motion for a formulation of the issues relating to the contractual liability limitation asserted by Quality does not present this Court with a novel issue. In fact Opinion at 702–05 dealt extensively with that precise subject, determining (1) that Taylor had agreed to the liability limitation with Quality, (2) that Quality never waived its rights to enforce that limitation and (3) that on the facts before the Court at that time Quality was not estopped from enforcing its contractual liability limitation.

However, Opinion at 705 was quite careful to note:

If Quality had misrepresented itself and Taylor had then executed the contract in the mistaken belief it was still dealing with Griswold (a company in which Taylor may have had faith based on its prior dealings), an estoppel might arise.

By way of further explanation Opinion *id.* (emphasis in original) stated:

What is relevant on the estoppel issue, of course, is not necessarily those actual facts [the facts then before this Court] but rather how Quality might have falsely portrayed them. As to that, however, on the evidence before this Court Corbett's letter simply cannot be imputed to Quality. Again there is a total absence of any fact demonstrating Quality either knew or approved of her letter. Because there is no showing whatever of any misrepresentation *by Quality*, this last weak reed on which Taylor's estoppel defense seeks to lean is rejected as well.

Now Taylor has moved again under Rule 16(a), asserting that new facts have been uncovered—facts that suggest that Quality did know and may have approved of that letter— and further asserting that those

new facts preclude defendants from enforcing the contractual liability limitation.

As to the potential existence of such new facts, Taylor is right: As outlined in this opinion under *Fraud-based Claims*, there is sufficient evidence from which a factfinder might determine that Quality had knowingly misrepresented or concealed a material fact with the intent that such misrepresentation or concealment be acted upon by Taylor.[18] But just as the Opinion issued a caveat in terms of the *then*-known facts, this Court must stress that is only half the battle—to estop Quality from enforcing its contractual liability limitation, Taylor must also show (1) that it was unaware of the untruth of the representations *both* at the time made *and* at the time they were acted upon and (2) that it *in fact* relied upon the misrepresentation. Any showing of reliance may be difficult to make, given that Taylor negotiated a *new* contract *with Quality* after August 1986 while independently dealing with Corbett regarding a Griswold contract for storage in New Jersey at the same time. But "difficult" is not necessarily the same as "impossible," and it does appear from the presentation to date that issues of fact remain as to whether Quality should be estopped from enforcing its contractual liability limitation.

### Conclusion

This opinion has narrowed the triable issues in the manner summarized in its opening paragraph and detailed in its textual discussion. This action is set for a status hearing at 9 a.m. July 23, 1990 to discuss the remaining scope of the litigation (in terms of the length of trial and any other relevant matters) and to set a trial date.

---

18. It will be recalled from that earlier discussion (see n. 7) that the Illinois formulation of fraud principles emphasizes direct misrepresentations. Estoppel, though, has specifically been expressed to include material concealment intended to be acted on as well. *Strom Int'l, Ltd. v. Spar Warehouse and Distributors, Inc.,* 69 Ill.App.3d 696, 703, 26 Ill.Dec. 484, 489, 388 N.E.2d 108, 113 (1st Dist.1979) (citation omitted) sets out the principles for evaluating a claimed estoppel:

> Estoppel applies if: (1) defendant has made some misrepresentation or concealment of a material fact; (2) defendant had knowledge, either actual or implied, that the representations were untrue at the time they were made; (3) plaintiff was unaware of the untruth of the representations both at the time made and at the time they were acted upon; (4) defendant either intended or expected his representations or conduct to be acted upon; (5) plaintiffs did in fact rely upon or act upon the representations or conduct; and (6) plaintiff has acted on the basis of the representations or conduct such that he would be prejudiced if defendant is not estopped.